**Beverly TSOMBANIDIS, Oxford House, Inc., and John Does One Through Seven (Current and prospective residents of 421 Platt Avenue, West Haven, Connecticut), Plaintiffs,**

v.

**CITY OF WEST HAVEN, CONNECTICUT, First Fire District of the City of West Haven, Defendants.**

No. 3:98CV01316(GLG).

United States District Court,
D. Connecticut.

Dec. 28, 2001.

---

Jonathan B. Orleans, Sarah W. Poston, Zeldes, Needle & Cooper, Bridgeport, CT, Steven G. Polin, Washington, DC, for Plaintiffs.

Michael P. Farrell, West Haven, CT, Martin S. Echter, Office of Corporation Counsel, New Haven, CT, Thomas R. Gerarde, Melinda P. Frechette, Howd & Ludorf, Hartsford, CT, for Defendants.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

GOETTEL, District Judge.

This action is brought under the federal Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, *et seq.* ("FHAA"), and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12165 ("ADA"). Plaintiffs allege that the defendants' application and enforcement of the City's zoning, building, and property maintenance codes, and the State Fire Safety Code to a group home for recovering alcoholics and drug addicts discriminates against persons with a disability or

handicap, in violation of these federal statutes.

Following an eight-day bench trial, the Court renders the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. The property at 421 Platt Avenue in West Haven, Connecticut is known as Oxford House–Jones Hill (hereinafter "OH–JH" or "the House"). It is a two-story house with a yard, located on a .34 acre lot in a residential area of detached single-family houses. The area is zoned as an "R–2 District," in which only single-family residences are permitted. (West Haven Zoning Regulations, Art. II, Ch. 2, § 2–2.1B.1.a.)

2. Plaintiff, Beverly Tsombanidis, owns the property at 421 Platt Avenue, West Haven, Connecticut. She purchased it in July 1997 after it had been vacant for approximately two years. Since August 1997, the property has been continuously used as OH–JH.

3. Plaintiffs John Does One through Seven are current and/or prospective residents of OH–JH. They are all in recovery from drug and/or alcohol addiction. While there may have been eight residents of OH–JH during a short period immediately after OH–JH was established, the number of residents needed to fill the House has been seven since that time and will not exceed seven.

4. Oxford House, Inc. (hereinafter referred to as "OHI") is an umbrella organization for over 900 independent Oxford Houses operating nation- and world-wide. It is a nonprofit, tax-exempt, Delaware corporation with its principal place of business in Silver Spring, Maryland.

5. Oxford Houses are unsupervised, independent residences for men or women recovering from drug and/or alcohol addiction.

6. Currently, there are twenty-six Oxford Houses in the State of Connecticut, and seven, including OH–JH, in the greater New Haven area.

7. Defendant, the City of West Haven (hereinafter referred to as "the City" or "West Haven"), is a municipal corporation within the State of Connecticut and organized under the laws of the State of Connecticut. West Haven has authority to enforce its Zoning Regulations (included in the Land Use Regulations of the City of West Haven), the State Building Code,[1] and Property Maintenance Code[2] over land and dwellings within its boundaries.

---

1. The State Building Code regulates the design, construction and use of buildings or structures to be erected and the alteration of buildings already erected. Conn. Gen.Stat. § 29–252(a). It is applicable to all towns, cities, and boroughs in the State, pursuant to Conn. Gen.Stat. § 29–253(a).

2. The Property Maintenance Code of the City of West Haven adopts the BOCA [Building Officials & Code Administrators International, Inc.] National Property Maintenance Code/ 1993 (4th ed.) with certain modifications. West Haven City Code §§ 127–1, 127–3. The Property Maintenance Code defines its scope as follows:

This Code is to protect the public health, safety and welfare in all existing structures, residential and nonresidential, and all existing premises by establishing minimum requirements and standards for premises, structures, equipment, and facilities for light, ventilation, space, heating, sanitation, protection from the elements, life safety, safety from fire and other hazards, and for safe and sanitary maintenance; fixing the responsibility of owners, operators and occupants; regulating the occupancy of existing structures and premises, and providing for administration, enforcement and penalties.

PM–101.2 (original emphasis omitted).

8. Defendant First Fire District of the West Haven Fire Department (hereinafter referred to as "the Fire District") is a political subdivision of the State of Connecticut, located wholly within the City of West Haven, and has the authority to enforce the State Fire Safety Code within the City of West Haven.

9. Oxford Houses are financially self-sustaining and OH–JH does not receive, and has not received, support from governmental or other sources. Oxford Houses operate on the premise that people in recovery from drug and alcohol addiction will succeed in remaining sober if they live in a highly supportive environment where substance abuse is non-existent and actively resisted. Many Oxford House residents have made multiple attempts at recovery prior to their arrival at an Oxford House. Statistics indicate that the average length of stay in an Oxford House is thirteen months. A founder of Oxford House claims that eighty percent of those who live in an Oxford House maintain long-term sobriety.

10. The first Oxford House was established in 1975 by Paul Molloy and others. OHI was established in 1987. Since that time, Oxford Houses have been established in thirty-four states in this country as well as two other countries around the world.

11. Through local chapters, OHI facilitates the initiation of each new Oxford House, by providing information and contacts with other local Oxford Houses, and ensuring that experienced Oxford House residents from an established house are available to serve as the core for the new Oxford House.

12. The ground rules for every Oxford House are the same: 1) the house is not supervised and is governed democratically by its residents; 2) the house is rented, and the rent is paid by the residents; and 3) any resident who uses drugs or alcohol is immediately expelled. Thus, an Oxford House is able to carry on in spite of changes in the number of residents, in order to maintain the therapeutic community that is the essence of the Oxford House model.

13. In addition to these ground rules, OHI has observed that Oxford Houses that meet the following criteria are much more likely to succeed: 1) location in single-family residential neighborhoods, not close to neighborhoods where drugs and alcohol are easily available; 2) proximity to the site(s) of regular Alcoholics Anonymous and Narcotics Anonymous meetings; 3) near a commercial area substantial enough to provide residents with easy access to basic necessities such as groceries and household items; 4) near a range of sites of employment, and/or close to public transportation so that residents can travel to their jobs; 5) large enough for a minimum of six people to live, yet small enough that bedrooms are shared by the residents. To the extent they meet these criteria, Oxford Houses are designed to allow people in recovery from addiction to create a temporary home, and return to sober, productive lives.

14. All of these findings are consistent with fundamental principles of recovery. Alcoholism and drug addiction are lifetime diseases. They are chronic, progressive and, ultimately, fatal. Avoiding relapse and progressing in recovery, therefore, are important aspects of a recovering addict's life. Finding and staying in a healthy, functional environment, surrounded by people who are not abusing alcohol or drugs, away from people and situations that previously triggered substance use, with access to transportation and work opportunities, are essential elements to avoiding relapse.

15. The efficacy of the Oxford House model, as a means of helping individuals recovering from alcoholism and drug addiction to prevent relapse and maintain a sober lifestyle, has been recognized by the United States Congress. *See* 135 Cong. Rec. H4860–02, 1989 WL 196098. In passing the Anti–Drug Abuse Act of 1988, P.L. 100–690, § 2036, Congress made federal block grant funds available to States to create a revolving fund for interest-free, short-term loans to groups of people in recovery who rent homes that: 1) are democratically self-governing; 2) are self-supporting; and 3) immediately expel anyone who uses drugs or alcohol. In sum, the Oxford House model is a highly successful, rehabilitative method, particularly when its members attend Alcoholics Anonymous or Narcotics Anonymous (or similar organizations') meetings.

16. A long-time resident of West Haven and active in community service for over twenty years, plaintiff Beverly Tsombanidis bought 421 Platt Avenue with the intention of creating a place where people in recovery from drug and alcohol addiction would work, live, and return to productive lives. She had heard about Oxford Houses through an outreach program in West Haven, and contacted the president of the Oxford House–New Haven chapter, who told her about how Oxford Houses are run. He suggested to Ms. Tsombanidis that seven would be the ideal number of residents at 421 Platt Avenue, and that two refrigerators, two bathrooms, and smoke detectors would be needed. Ms. Tsombanidis assured that these recommendations were fulfilled, and she made numerous repairs and improvements to the House before the tenants moved in. A previous owner of 421 Platt Avenue had operated a day care center there, and there were already interconnected smoke detectors between two bedrooms upstairs and the upstairs hallway.

17. On July 26, 1997, Ms. Tsombanidis signed a lease with OH–JH, and the original John Does began to move in. The lease was renewed every two years thereafter, reducing the maximum number of tenants from nine to eight.

18. On or about July 27, 1997, OH–JH was chartered by OHI. It became part of the New Haven chapter of OHI. The House pays monthly dues, and one of its residents attends monthly chapter meetings of OHI.

19. Within days after the original residents moved into OH–JH, neighbor Michael Turner approached Ms. Tsombanidis and asked who the men were. Turner asked OH–JH residents what they were doing there. Turner had bothered Ms. Tsombanidis when she was working on the House after Turner learned that it would be an Oxford House. Other neighbors were upset and angry as well. The neighbors did not want OH–JH in their neighborhood because it was a house for recovering drug addicts and alcoholics. They protested to the Mayor and City Council, claiming that the occupants might be criminals or perverts. However, in the years OH–JH has been operating, no resident has been charged with a crime or misdemeanor.

20. On September 8, 1997, an anonymous call was made to the City of West Haven by a neighbor complaining that 421 Platt Avenue was operating as an illegal boarding house. The next day, the City received a call complaining that the House was being used "as a boarding house or halfway house."

21. By late September or early October, within months after the John Doe plaintiffs had moved into OH–JH, a group of neighbors went to see H. Richard Borer, the Mayor of West Haven, to complain about the use of 421 Platt Avenue as a

house for people in recovery from addiction. The neighbors met with the Mayor twice, complaining that "a drug rehab house" had been opened in their neighborhood without the neighbors being notified and, in a second meeting, asking what was going on with this "rehab house." After the second meeting, neighbor Paul Frosolone pressed the issue of the use of 421 Platt Avenue by asking the Mayor and Corporation Counsel about it for the next three or four weeks. Frosolone, who was running for City Council at the time, circulated a petition with the assistance of Turner to let the neighbors know that the people living at 421 Platt Avenue were going through rehabilitation and were disabled.

22. Eighty-four neighbors of OH–JH signed a petition which, on October 14, 1997, was presented to the City Council, with approximately seventy-five neighbors in attendance "protesting the use of the property located at 421 Platt Avenue in a residential neighborhood ... as a rooming house for people in rehabilitation ... in violation of numerous planning and zoning codes," and "demanding an immediate cease and desist of this type of operation in a residential neighborhood setting." Frosolone told the City Council he "want[ed] the people out of this property," and several other neighbors repeated that message. Turner also spoke, calling the house "disgusting." Neighbor Walter Boresen stated that the OH–JH residents "drove like maniacs," and insisted that "these people should be put out tomorrow." Three of the neighbors told the City Council they were in fear of the OH–JH residents. Some complained they were in fear of OH–JH residents based on newspaper articles about residents of "halfway houses" in other towns. The neighbors asked the City Council to get the OH–JH residents out. Turner talked with Councilman Ed Grandfield after the

City Council meeting to ascertain the status of the matter. The neighbors were disappointed that they did not secure the prompt removal of the residents.

23. During the fall of 1997, the neighbors also talked to City officials in the Planning and Zoning Office in City Hall, including Jim Hill, Commissioner of Planning and Development, Alfredo Evangelista, Zoning Enforcement Official, and Michael McCurry, Property Maintenance Code Official, who said that they had already received calls about 421 Platt Avenue. Frosolone said he later spoke with McCurry three or four times again, McCurry informing him that OH–JH had been cited for violations of building and fire codes and given a limited period to correct the violations.

24. The press covered some of these events and reported the significant community opposition to OH–JH as a home for people with disabilities, which community opposition the City officials claim to have forgotten.

25. City officials, including Mayor Borer, Hill, Evangelista, and McCurry, claimed that their actions with respect to OH–JH were based on the number of people living in the House. These officials, however, were certainly aware of and were influenced by the opposition of OH–JH neighbors and members of the community, who were plainly disturbed not so much by the number of people living at OH–JH as by the fact that the John Doe plaintiffs were people recovering from drug and alcohol addiction.

26. On September 8, 1997, the day the City received an anonymous complaint that 421 Platt Avenue was operating as an illegal boarding house and Ms. Tsombanidis was doing work without a permit, Assistant Property Maintenance Code Offi-

cial Michael McCurry inspected 421 Platt Avenue.

27. On September 8, McCurry posted signs on the front and back doors of the house, publicly charging Ms. Tsombanidis with performing work without a permit.

28. The next day, September 9, McCurry and Evangelista proceeded to inspect the property together. Ms. Tsombanidis informed them that 421 Platt Avenue was an Oxford House, and a home for people in recovery from drug and alcohol addiction and told them how it operated. McCurry responded to Ms. Tsombanidis' information about Oxford House by telling Ms. Tsombanidis that he was "very angry," that the OH–JH residents had no right to be in the neighborhood, and that he wouldn't want addicts in his neighborhood. He ordered her to have them out within twenty-four hours.

29. By letter dated September 9, 1997, Evangelista informed Ms. Tsombanidis that 421 Platt Avenue was "an Illegal Boarding House in a residential zone," in "direct violation" of the Zoning Regulations of the City of West Haven, and ordered her to "remove the illegal boarding house" from the property within ten days of her receipt of the letter.[3] The letter

informed Ms. Tsombanidis that a $99.00 fine would be imposed for each day that she failed to comply with his letter. These fines were not enforced.

30. In an eleven-and-one-half page letter dated September 11, 1997, Charles E. van der Burgh, Chief Financial Officer for OHI, provided Evangelista with a full explanation of the Oxford House concept and requested that, as a reasonable accommodation pursuant to the FHAA, the City of West Haven treat OH–JH as a single-family dwelling and permit OH–JH to remain at 421 Platt Avenue. Alternatively, he asked that enforcement of the zoning ordinances be held in abeyance until this matter was resolved. Evangelista gave copies of all letters from OHI to his supervisor, James Hill, and to Corporation Counsel.

31. By letter dated September 16, 1997, McCurry informed plaintiff, Ms. Tsombanidis, that she was in violation of PM 202.0 "(one family dwelling)," as well as nine other sections of the City of West Haven Property Maintenance Code. The Property Maintenance Code defines a one-family dwelling as "[a] building containing one dwelling unit with not more than three

---

**3.** Section 1–3.2 of the West Haven Zoning Regulations, Art. I, Ch. 3, defines "Rooming House (including boarding house)" as

> Roomer, boarder or lodge person or persons occupying room or rooms forming a habitable unit limited to sleeping and living accommodations but not individual cooking facilities. It is further defined as any building which is used in whole or in part where the sleeping accommodations are furnished for hire or other consideration for more than one (1) but not more than eight (8) guests or employees of the management. . . .

The only residences permitted in an R–2 zone, which is the zoning classification of 421 Platt Avenue, are single-family residences. Zoning Regulations § 2–2.1.B.1. A "Family" is defined by the Regulations as:

> One or more persons who live together and maintain a common household, related by blood marriage, or adoption. A group of not more than three (3) persons who need not be so related who are maintaining a common household together in a single dwelling unit and maintaining a household shall also be considered a family. A roomer, boarder or ledger [sic], shall not be considered a member of the family, and no roomer, boarder or lodger shall be permitted where the family is divided as a group of unrelated persons. A common household shall be deemed to exist if all members thereof have access to all parts of the dwelling unit.

West Haven Zoning Regulations, Art. I, Ch. 3, § 1–3.2.

lodgers or boarders." The Property Maintenance Code further defines a "rooming house" as a "building arranged or used for lodging for compensation, with or without meals, and not occupied as a single-family dwelling or a two-family dwelling." (West Haven Property Maintenance Code § 127–1, adopting BOCA National Property Maintenance Code § PM–202.0 (General Definitions) (4th ed.1993), as modified by § 127–3.) McCurry ordered her to make fourteen alterations to the property and to reduce the number of tenants to three within fourteen days in order to avoid penalties for operating an illegal boarding house.

32. Ms. Tsombanidis made the fourteen repairs ordered by the Property Maintenance Code Official, but she did not evict any OH–JH residents or otherwise reduce the number of residents at 421 Platt Avenue.

33. On September 16, 1997, Steven Polin, General Counsel for OHI, made another request to Evangelista that OH–JH be treated as a single-family home, pursuant to the FHAA.

34. Although both Van der Burgh's and Polin's letters had invited a response and/or questions from Evangelista, he did not respond to these letters.

35. On September 22, 1997, Evangelista issued a citation ordering Ms. Tsombanidis to pay a fine of $99.00 for violation of the West Haven Zoning Regulations for operating an illegal boarding house. This citation also was not enforced.

36. Van der Burgh wrote a second letter to Evangelista on September 25, 1997, again informing him that the City of West Haven's enforcement actions were violating plaintiffs' rights pursuant to the FHAA.

37. On November 24, 1997, Evangelista sent another letter to Ms. Tsombanidis ordering her to comply with the regulation limiting to three the number of unrelated persons in a single-family home, and again threatening her with fines and penalties. This letter and the citations informed Ms. Tsombanidis of her right to appeal the decision to the Zoning Board of Appeals, or to seek a special use exception from that body.

38. On December 22, 1997, Building Official Frank Gladwin, following an inspection of OH–JH on December 12, 1997, informed Ms. Tsombanidis that the existing one-family dwelling at 421 Platt Avenue has been changed to a "boarding house use," and that as a result she was required to make fundamental structural changes to the house, including creating bedroom emergency exit windows, and a door and stairs leading out and to the ground from the second floor.

39. West Haven sent Ms. Tsombanidis a second citation dated March 20, 1998, ordering her to pay a fine of $99.00 for her violation of the City's Zoning Regulations. This citation also was not enforced.

40. On March 24, 1998, Attorney Polin sent a letter to Building Official Frank Gladwin and Fire Inspector Richard H. Spreyer, reiterating his position that operation of OH–JH did not constitute a change in use from a single-family dwelling to a boarding house and that application of the Connecticut Fire Safety Code and Building Code to a group of recovering substance abusers violated the FHAA. He requested that West Haven hold in abeyance further notices of violations until the issues raised by his letter had been resolved. He argued that the costs involved in making the required changes were prohibitive for both OH–JH and Ms. Tsombanidis and that continued enforcement of the Building and Fire Safety Codes would result in the constructive eviction of the current residents, thus plac-

ing in jeopardy their recovery from alcoholism and drug abuse.

41. While Gladwin responded to this letter, he did not acknowledge or respond to plaintiffs' request for a reasonable accommodation, taking the position that he had no authority in that regard and had little knowledge of the FHAA, although he did not advise Mr. Polin of this.

42. West Haven enforces its Zoning Regulations, the Property Maintenance Code, and the State Building Code, primarily when responding to complaints.

43. James Hill, as Commissioner of Planning and Development of the City of West Haven, was the supervisor of the members of his department who made these inspections and issued the citations. He received each of the Van der Burgh and Polin letters from OHI.

44. Hill had never previously, in his eleven-and-one-half years as Commissioner, attempted to force inhabitants of an illegal boarding house out by inspecting and enforcing the zoning regulations against it, claiming that most violators ceased such activity when confronted. Nevertheless, when the neighbors at 421 Platt Avenue complained about a "rehab house" moving into that address, Ms. Tsombanidis received no fewer than two letters and two citations for zoning violations, one notice of violations of the Building Code, and one notice of violations of the Property Maintenance Code.

45. Furthermore, Hill failed to respond to any of the letters from OHI and its attorney requesting a reasonable accommodation for OH–JH. In spite of all the letters from OHI and its attorneys describing the nature of Oxford House, identifying and describing the protections afforded to Oxford Houses under federal law, Hill, on behalf of West Haven, persist-

ed in his position that OH–JH was an illegal boarding house.

46. Mayor Borer, as chief executive of the City of West Haven, was responsible for Hill's management of the 421 Platt Avenue issue, after complaints had been made by neighbors as to the progress of Planning and Zoning investigations.

47. Mayor Borer communicated with Hill during the months in which West Haven was attempting to enforce the Zoning Regulations, Property Maintenance and Building Codes against OH–JH.

48. John DeStefano, the Mayor of the City of New Haven, spoke to Mayor Borer about OH–JH, telling Borer that Oxford Houses have special federal status which allow them to facilitate their operations. Borer also was aware, either from DeStefano or from West Haven Corporation Counsel, that the ADA may afford Oxford Houses special status that usurps the zoning codes. Nevertheless, Borer said nothing to Hill about this issue. Borer considered it his role to protect the integrity of West Haven neighborhoods and to ensure the strict enforcement of the codes in West Haven.

49. In early winter, 1997, a city employee contacted the West Haven Fire Department about OH–JH.

50. Despite plaintiffs' repeated requests for a reasonable accommodation during the fall of 1997 and into 1998, West Haven did not respond to these requests other than to continue its attempts to enforce the Zoning Regulations, Property Maintenance and Building Codes.

51. On May 21, 2001, Ms. Tsombanidis applied to the City of West Haven Zoning Board of Appeals for a special use exception in order to continue to use 421 Platt Avenue as OH–JH. Ms. Tsombanidis, through counsel, provided comprehensive documentary support for the application to

the Zoning Board of Appeals, and a public hearing was held on the application on June 20, 2001, at which testimony was presented.

52. At its regular meeting on August 15, 2001, the Zoning Board of Appeals denied this application for a special use exception by a unanimous vote. The Board, which also includes at least one member who is active in assisting homeless who are recovering alcoholics or drug abusers, had previously approved a special use exception for another residential facility for persons recovering from alcohol and/or other substance abuse. The Board denied the application of the plaintiffs because OH–JH is entirely self-run by the residents without any outside, professional contact person, and the residents utilize only an in-person interview process to screen prospective new residents.

53. None of the City officials who oversaw the enforcement of the West Haven Zoning Regulations, Property Maintenance and Building Codes against plaintiff has ever received any training with respect to the FHAA or the ADA, at least insofar as they apply to people such as the individual plaintiffs.

54. As a result of the treatment she received from West Haven, through its agents, including, but not limited to, public accusations of code violations, biased remarks by at least one individual inspector, repeated threats of substantial monetary sanctions, repeated failures to respond to requests made on Ms. Tsombanidis' behalf for reasonable accommodations, and the ultimate denial of her May 21, 2001 application to the Zoning Board of Appeals for a special use exception, Ms. Tsombanidis suffered some emotional distress and anxiety.

55. In assisting Ms. Tsombanidis and the John Doe plaintiffs in the face of the enforcement attempts by West Haven as described above, plaintiff OHI incurred costs. It incurred out-of-pocket costs of $900 for travel and lodging to send its founder and Chief Executive Officer to testify at the trial in this matter on September 13–14 and October 5, 2001. Mr. Molloy and other corporate employees spent many hours between the first week of September 1997, when the City's enforcement actions began, through August 2001, in addressing this dispute with West Haven and the Fire District. Specifically, Mr. Molloy spent a total of 541 hours addressing plaintiffs' dispute with the City of West Haven and the Fire District. At his hourly rate of $66.68/hour, the cost to OHI was $36,073.88. Additionally, Molly Brown, an employee of OHI, spent a total of 293 hours addressing this dispute between plaintiffs and the City and Fire District. At her rate of $19.21/hour, the cost to OHI was $5,628.53.

56. In early December 1997, Fire Inspector Richard Spreyer of the Fire District, was notified of the City's code enforcement actions against plaintiffs when he received a copy of McCurry's September 16, 1997 letter to Ms. Tsombanidis.

57. On or about December 12, 1997, Spreyer accompanied City of West Haven Building Official Gladwin to inspect OH–JH.

58. By letter dated January 5, 1998, Spreyer informed Ms. Tsombanidis that 421 Platt Avenue was a "lodging or rooming house" under the Connecticut Fire Safety Code and that as a result of this classification, she was required 1) to enlarge the windows in each bedroom; 2) to enclose the interior stairs; 3) to install fire alarm and smoke detection systems; and 4) to install (pursuant to section of the Fire Safety Code section that applies only to "[a]ll new lodging or rooming houses," Fire Safety Code § 20–3.5.2) an automatic

sprinkler system throughout the house. Spreyer's determination that 421 Platt Avenue was a lodging or rooming house was based on the fact that more than three unrelated people lived there.

59. In December 1997, the Connecticut Fire Safety Code defined "lodging or rooming houses" as

buildings that provide sleeping accommodations for a total of 16 or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants except as provided in Chapter 21.

Today, the Code defines "lodging or rooming houses" as

buildings or portions thereof that do not qualify as a one- or two-family dwelling that provide sleeping accommodations for a total of 16 but not fewer than seven persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants except as provided in Chapter 21.

60. In December 1997, the Connecticut Fire Safety Code defined "one- and two-family dwellings" as

buildings containing not more than two dwelling units in which each living unit is occupied by members or a single family with no more than five outsiders, if any, accommodated in rented rooms.

Today, the Code defines "one- and two-family dwellings" as

buildings containing not more than two dwelling units in which each living unit is occupied by members of a single family with no more than six outsiders, if any, accommodated in rented rooms.

61. When Spreyer inspected OH–JH in 1997, there were six residents living at OH–JH. Had he treated one resident as a "member of a single family" and the other five as "outsiders," and classified OH–JH at that time as a one-family dwelling under the Fire Safety Code, Ms. Tsombanidis would not have been required to bring the house into compliance with the Code's provisions applicable to "lodging or rooming houses."

62. The Fire District has no system or practice of inspecting one- and two-family dwellings in residential zones, in the absence of complaints from neighbors or others, to determine whether a violation of the Fire Safety Code has occurred.

63. On March 9, 1998, Spreyer sent Ms. Tsombanidis another letter ordering her to alter OH–JH so as to comply with the Fire Safety Code's requirements for lodging and rooming houses within fifteen days. He mentioned the possibility of civil proceedings and criminal penalties, including a fine and incarceration if she did not comply.

64. By letter dated March 24, 1998, Attorney Polin responded to Spreyer's March 9, 1998 letter, informing Spreyer that the use of 421 Platt Avenue as OH–JH did not constitute a change in use, and that the application of the Fire Safety Code required by Spreyer's letters of January 5 and March 9 to OH–JH violated the FHAA and the ADA. He requested that, as a reasonable accommodation, OH–JH be treated as a single-family home for Fire Safety Code enforcement purposes.

65. By letter dated March 26, 1998, Spreyer forwarded Attorney Polin's March 24 letter to Douglas Peabody, Deputy State Fire Marshal at that time, along with his entire file, and requested a determination from Peabody as to the occupancy classification of 421 Platt Avenue under the State Fire Safety Code.

66. By letter dated May 4, 1998, Peabody responded to Spreyer. Peabody stated in his letter that under the Fire

Safety Code, a one- or two-family dwelling could include a single family and no more than five outsiders. With more than five outsiders, a residence would be subject to the lodging and rooming house provisions of the Fire Safety Code. Peabody acknowledged that there was no definition of the term "single family" in the National Fire Protection Association ("NFPA") Life Safety Code, on which Connecticut's Fire Safety Code is modeled. Referring to "[c]ommon use dictionary definitions" of the term "family" as well as a "historic" definition developed by the NFPA Committee on the Life Safety Code, Peabody concluded that the residents of 421 Platt Avenue did not meet the requirements of a "family" and, instead, OH–JH should be classified as a lodging or rooming house for purposes of applying the Connecticut Fire Safety Code.

67. Neither Peabody nor any member of his staff had visited OH–JH or become aware of the actual operations of the household prior to issuing the May 4, 1998 letter. No mention was made in the letter concerning the nature of the household, the organization or general level of housekeeping in the household at OH–JH, fire safety measures already in place, or communication among members of the household regarding fire safety.

68. Peabody had been advised by a member of his staff and by an Assistant Attorney General assigned to his office that he could, consistent with the language of the Connecticut Fire Safety Code, classify six unrelated individuals living together as a "family" plus five outsiders. Peabody rejected that interpretation.

69. Peabody further advised Spreyer in the May 4 letter to "consult with [West Haven] corporation counsel" as to whether the FHAA applied to OH–JH.

70. Spreyer did consult with the City of West Haven's Corporation Counsel, who referred him to the State Attorney's Office. Assistant State Attorney Mary Galvin advised Spreyer that the FHAA would have no application in this instance because the Life Safety Code was at issue, rather than a zoning code.

71. Spreyer proceeded to rely on the May 4 Peabody letter as confirmation of his position, and to substantiate his application of the Connecticut Fire Safety Code in this case to determine that 421 Platt Avenue, in which there were more than five "outsiders," was not a single-family household. Even before consulting with Attorney Galvin, however, Spreyer (relying on Peabody's May 4 letter), advised Ms. Tsombanidis that he was "continuing with the second abatement notice" because 421 Platt Avenue, in which there were more than five "outsiders," was not a single-family household.

72. On June 15, 1998, Spreyer re-inspected 421 Platt Avenue, and on June 16, 1998, he sent Ms. Tsombanidis a final notice of fire/life safety hazards, stating that imprisonment of up to six months and/or criminal fines from $200 to $1,000 would be imposed in the event she did not comply.

73. On August 17, 2001, Ms. Tsombanidis made a request to the Fire District, in the form of a request for exemptions from the Fire District's enforcement of the Fire Safety Code provisions enumerated in Spreyer's January 5, 1998 letter.

74. As of the commencement of the trial of this action, Spreyer had not changed his position that OH–JH was a lodging or rooming house even though the Connecticut Fire Safety Code was amended in April 2000 to permit up to six "outsiders" to live in a "single-family dwelling." Despite this amendment, he had not been advised by the State Fire Marshal's office to change his position in this regard. However, on October 16, 2001, at the trial

of this case, Deputy State Fire Marshal John Blaschik testified under oath that one of the residents of OH–JH may be considered a "member of a single family" and the other six may be considered "outsiders." Blaschik further testified that OH–JH should now be classified as a single-family occupancy under the Connecticut Fire Safety Code. In reliance on Blaschik's testimony, Spreyer promptly notified Ms. Tsombanidis that he would follow the new interpretation and that she should disregard the previous abatement notices issued by his office which, in any event, had not been enforced. Spreyer testified that he would treat OH–JH as a single-family occupancy henceforth.

75. Neither First Fire District Inspector Spreyer nor former Deputy State Fire Marshal Peabody has ever had any training with respect to the FHAA or the ADA, at least insofar as it applies to people such as plaintiffs.

76. As a result of the treatment she received by the defendant First Fire District, through its agent Richard Speyer, including, but not limited to, its threats of substantial monetary sanctions and criminal prosecution, Ms. Tsombanidis suffered some emotional distress and anxiety.

77. In assisting Ms. Tsombanidis and the John Doe plaintiffs in the face of the enforcement attempts by the Fire District as described above, plaintiff OHI incurred costs. It incurred out-of-pocket costs of $900 for travel and lodging to send its founder and Chief Executive Officer to testify at the trial in his matter on September 13–14 and October 5, 2001. Mr. Molloy, and other corporate employees, spent many hours between December 12, 1997, when the Fire District's enforcement actions began, through August 2001, in addressing this dispute with the City and the Fire District.

### CONCLUSIONS OF LAW

The FHAA[4] and Title II of the ADA, and the regulations promulgated thereunder, prohibit housing discrimination by governmental entities against handicapped persons or persons with disabilities.[5] *See* 42 U.S.C. § 3604(f)(1) and (f)(3)(B)[6] and 42 U.S.C. § 12132.[7] Both the FHAA and

---

4. The Fair Housing Act was amended in 1988 to protect persons with handicaps. The courts have recognized these amendments as a "clear pronouncement of a national commitment to *end the unnecessary exclusion of persons with handicaps* from the American mainstream." *See, e.g., Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1105 (3d Cir.1996) (emphasis in original).

5. The terms "handicap" and "disability" are used interchangeably in this opinion, unless indicated otherwise.

6. The Fair Housing Act, 42 U.S.C. § 3604, provides in relevant part that it shall be unlawful -

(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of -
 (A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
 (C) any person associated with that buyer or renter.
 (3) For purposes of this section, discrimination includes -

. . . . .

 (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...

7. The ADA, 42 U.S.C. § 12132, provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

Title II of the ADA have been interpreted to apply to municipal zoning regulations, practices, or decisions that subject persons with handicaps or disabilities to discrimination based upon their handicap or disability. *See Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 151 (2d Cir.1999); *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 45–46 (2d Cir.1997); *Connecticut Hosp. v. City of New London,* 129 F.Supp.2d 123, 135 (D.Conn.2001). The legal analyses under both statutes are essentially the same and, thus, we will consider them together.

■■■ There is no dispute in this case that the John Doe plaintiffs, as non-abusing, recovering alcoholics and drug addicts are members of a protected class under the FHAA and ADA. 42 U.C.S. § 3602(h); 24 C.F.R. § 100.201(a)(2); 42 U.S.C. § 12210(b)(1) and (2). As "aggrieved persons" and persons with a "handicap," plaintiffs are entitled to the protections of the FHAA, 42 U.S.C. § 3602(h) and (i), and, as "qualified individuals with disabilities," they are protected by the ADA. 42 U.S.C. § 12131(2); *see Connecticut Hosp.,* 129 F.Supp.2d at 125. Additionally, plaintiff Beverly Tsombanidis, as landlord of the property rented by OH–JH, and OHI, as the umbrella organization for all Oxford Houses and as the advocacy group for plaintiffs, have standing to pursue these claims against defendants.

■■■ Three theories of discrimination are available to a plaintiff alleging a violation of the FHAA or Title II of the ADA: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable accommodation. *Tsombanidis v. City of West Haven,* 129 F.Supp.2d 136, 150 (D.Conn.2001); *see also Smith & Lee Assocs. v. City of Taylor,* 102 F.3d 781, 790 (6th Cir.1996); *Wisconsin Correctional Serv. v. City of Milwaukee,* 173 F.Supp.2d 842 (E.D.Wis.2001); *Remed Recovery Care Centers v. Township of Willistown,* 36 F.Supp.2d 676, 683 (E.D.Pa.1999). In this case, plaintiffs initially asserted all three theories of recovery against both defendants. This Court previously granted the motion for summary judgment of the Fire District as to plaintiffs' claim of intentional discrimination. *Id.* at 153–55. Additionally, the Court held that plaintiffs' reasonable accommodation claims against both defendants were not ripe. *Id.* at 159–61. Since then, however, plaintiffs have sought a special use exception from the West Haven Zoning Board of Appeals, which unanimously denied plaintiffs' request, thus rendering their reasonable accommodation claim against the City ripe for review. As for plaintiffs' reasonable accommodation claim against the Fire District, although it was not ripe prior to trial, it is now ripe due to intervening changes in the State Fire Code, which the Deputy State Fire Marshal testified would allow OH–JH to be treated as a one-family dwelling, subject to the one-family dwelling provisions of the State Fire Safety Code. Accordingly, although the Court had previously denied plaintiffs' motion to amend their complaint to reassert a reasonable accommodation claim against the Fire District, in light of this concession, the Court will now grant that request *nunc pro tunc* to permit the complaint to conform to the evidence at trial, and will address herein the plaintiffs' reasonable accommodation claim against the Fire District.

In summary, in rendering its Conclusions of Law, the Court considers the theories of intentional discrimination, disparate impact discrimination, and failure to provide a reasonable accommodation against the City of West Haven. Against the Fire District, the Court considers the theories of disparate impact discrimination and fail-

ure to provide a reasonable accommodation.

## I. PLAINTIFFS' CLAIMS AGAINST THE CITY OF WEST HAVEN

### A. Intentional Discrimination by the City of West Haven

█ The position of the City has been, and continues to be, that OH–JH is a lodging or boarding house. It is not.[8] The residents' occupancy is not limited to a certain room or rooms in the House. There is no landlord, paid staff, or house manager involved in the operation of the House. There is no third person making decisions as to how the House should operate or who should live there. The residents make all the decisions themselves in a democratic manner. The residents live there by choice and can stay for unlimited periods of time and, indeed, some of them stay for a number of months. They rent the entire House, as opposed to a single room or rooms and have access to the entire House and all household facilities. Each pays an equal amount of rent regardless of the size of his room. There are no special locks on the bedroom doors. The residents function as a single housekeeping unit, paying all expenses out of a single household checking account, and sharing in the cooking, shopping, cleaning, and general care of the premises. The residents live together purposefully to create a "family" atmosphere, where all aspects of domestic life are shared by the residents and where they can provide each other with mutual support and encouragement to remain drug- and alcohol-free. Physically, the House is no different than any other single-family house. The lease is between the landlord and OH–JH, an unincorporated association composed of the residents at OH–JH. Thus, there is a direct landlord-tenant relationship between the actual residents and the landlord. There is no third-party or organization responsible for making the lease payments, other than the residents themselves.

█ Plaintiffs, on the other hand, claim that OH–JH is a single-family house. Literally, it is not because the residents are not related, whether by blood, marriage or adoption, and are not part of a single "family," as that term is traditionally defined. However, the definition of "family" set forth in the City's Zoning Regulations does not require that the residents be related so long as they do not exceed three in number and they "maintain [ ] a common household together," (which is deemed to exist "if all members thereof have access to all parts of the dwelling unit"). (West Haven Zoning Regulations § 1–3.2.) Additionally, the West Haven Property Maintenance Code § 127–1, (adopting the BOCA National Property Maintenance Code, 4th ed.1993) defines "family" as including a "group of not more than three unrelated persons living together as a single housekeeping unit in a dwelling unit." (PM–202.0, as amended by the West Haven Property Maintenance Code § 127–3). Thus, the fact that the OH–JH residents are not related by blood, marriage, or adoption, does not in and of itself preclude their being treated as a "family" under either the Zoning Regulations or Property Maintenance Code. Rather, it is that fact combined with the fact that they are more than three in number that cause OH–JH to run afoul of both City codes.

Following the Supreme Court's decision in *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d

---

8. *See* Definition of rooming house or boarding house under the West Haven Zoning Regulations, n. 3, *supra,* and definition of "boarding house" under the City's Property Maintenance Code, ¶ 31, *supra.*

801 (1995), there can be no question that the City's Zoning Regulations and Property Maintenance Code are covered by the FHAA. The issue before the Court in *City of Edmonds* was whether the definition of "family" in the City of Edmonds' zoning code qualified for the FHAA's exemption from coverage for "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1). The City of Edmonds' zoning provision at issue governed areas zoned for single-family dwelling units and defined "family" as "persons [without regard to number] related by genetics, adoption, or marriage, or a group of five or fewer [unrelated] persons." (Edmonds Community Development Code § 21.30.010 (1991).) Thus, except for the number of occupants, the City of Edmonds' zoning provision was virtually identical to the zoning provision at issue in the instant case. The Supreme Court, noting that the housing amendments to the Fair Housing Act had been enacted against the backdrop of an "evident distinction between municipal land-use regulations and maximum occupancy restrictions," 514 U.S. at 732, 115 S.Ct. 1776, held that the FHAA's exemption encompassed maximum occupancy restrictions [9] but not family composition rules, which are typically tied to land-use restrictions.[10] *Id.* at 734–35, 115 S.Ct. 1776. "In sum, rules that cap the total number of occupants in order to prevent overcrowding of a dwelling plainly and unmistakably ... fall within § 3607(b)(1)'s absolute exemption from the FHA[A]'s governance; rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain, do not." *Id.* at 735, 115 S.Ct. 1776 (internal quotations and citations omitted). Turning to the City of Edmonds' family composition provisions, the Court held that they were "classic examples of a use restriction and complementing family composition rule. These provisions do not cap the number of people who may live in a dwelling. In plain terms, they direct that dwellings be used only to house families." *Id.* at 735–36, 115 S.Ct. 1776. The Court rejected the City's argument that its zoning provisions should be considered a maximum occupancy restriction because it included unrelated occupants not exceeding five in number, finding that "[f]amily living, not living space per occupant, is what [the zoning provision] describes."[11] *Id.* at 737, 115 S.Ct. 1776.

Accordingly, based upon the holding in the *City of Edmonds* case, we hold that the provisions of the West Haven Zoning Regulations and Property Maintenance and Building Codes at issue are land use restrictions, not maximum occupancy limitations, and therefore are not exempt

---

9. Maximum occupancy restrictions cap the number of occupants per dwelling, typically in relation to the available floor space or the number and type of rooms. These restrictions ordinarily apply uniformly to all residents of all dwelling units. Their purpose is to protect health and safety by preventing overcrowding of a dwelling. *City of Edmonds*, 514 U.S. at 733, 115 S.Ct. 1776.

10. Land use restrictions, on the other hand, designate districts in which only compatible uses are permitted and incompatible uses are not allowed. "Land-use restrictions aim to prevent problems caused by the 'pig in the parlor instead of the barnyard.'" *City of Edmonds*, 514 U.S. at 733, 115 S.Ct. 1776 (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926)).

11. The Supreme Court's decision was limited to this single narrow issue and, unfortunately, did not resolve the larger issues presented by the instant case. *See City of Edmonds*, 514 U.S. at 737, 115 S.Ct. 1776.

from coverage by the FHAA. Thus, the issue that we must determine is whether the actions of the City in enforcing these Code provisions discriminated against plaintiffs because of their disabilities or handicap in violation of the FHAA and ADA.

 The City asserts that it did not intentionally discriminate against plaintiffs. It was simply enforcing the City Codes. It is well established, however, that the FHAA prohibits discriminatory zoning or land use decisions by municipalities, even when such decisions are "ostensibly authorized by local ordinance." *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 458 (D.N.J.1992); *see also* 42 U.S.C. § 3615 ("[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."); *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1343 (D.N.J.1991) (on motion for preliminary injunction: city's enforcement of zoning ordinance so as to prevent operation of local Oxford House in area zoned for single-family residences violated FHAA). As this Court observed in its earlier ruling in this case, a local government that uses its zoning powers in a discriminatory manner or enforces its building codes in a discriminatory manner toward handicapped individuals violates the FHAA and ADA. *Tsombanidis*, 129 F.Supp.2d at 151. "Otherwise lawful governmental actions become unlawful when done for the purpose of disadvantaging the handicapped." *Smith & Lee Assocs.*, 102 F.3d at 790.

 "The critical inquiry is whether a discriminatory purpose was a 'motivating factor' in the decision or actions" of the City. *Tsombanidis*, 129 F.Supp.2d at 151. As we noted, " '[t]he intent of which the court speaks is the legal concept of intent, to be distinguished from motive.' " *Id.* (quoting *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Fairfield*, 790 F.Supp. 1197, 1212 (D.Conn.1992)). Plaintiffs are not required to prove that the City officials were motivated by some purposeful, malicious desire to discriminate against them because of their handicap. "They need only show that their handicapped status was a motivating factor in the [City's] decision." *Id.* Factors to be considered in evaluating a claim of discriminatory decision-making include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria. *Id.* at 152 (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). These factors are neither exclusive nor mandated, but constitute a "framework within which [the Court may] conduct its analysis. . . . It is necessary that each case be evaluated on its own facts." *Stewart B. McKinney Found.*, 790 F.Supp. at 1211. Moreover, as we recognized, governmental actions taken in response to significant community bias may be tainted with discriminatory intent even where municipal employees and officials were not themselves biased. *Tsombanidis*, 129 F.Supp.2d at 152 (citing *Innovative Health Sys.*, 117 F.3d at 49); *see also Pathways Psychosocial v. Town of Leonardtown*, 133 F.Supp.2d 772, 782 (D.Md.2001). Once the plaintiffs have shown that the defendant's decision was motivated at least in part by a discriminatory animus, the burden shifts to the defendant to prove that it would have made the same decision even if it had not been

motivated by an unlawful purpose. *Arlington Heights,* 429 U.S. at 270, n. 21, 97 S.Ct. 555.

### 1. Discriminatory Impact

 The discriminatory impact of the City's classifying OH–JH as a boarding or rooming house is undeniable. OH–JH will not be able to operate in a single-family zoned district of the City; OH–JH residents, unlike a family with seven related members, will not be able to live in any neighborhood with single-family zoning; and recovering alcoholics and drug addicts will be unable to avail themselves of an Oxford House group home in a residential setting in order to enhance their chances of making a full recovery. As recovering alcoholics and drug addicts, the John Doe plaintiffs need to live in a safe, supportive, and drug-and-alcohol-free living environment during their recovery period. *See Connecticut Hosp.,* 129 F.Supp.2d at 129; *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. at 459 (finding that it is crucial for recovering alcoholics and substance abusers to have a supporting, drug and alcohol free living environment, which substantially increases an individual's chances of recovery); *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179, 1183 (E.D.N.Y.1993)("Recovering alcoholics or drug addicts require a group living arrangement in a residential neighborhood for psychological and emotional support during the recovery process.") Thus, the discriminatory impact is substantial.

### 2. Historical Background

The historical background of the City's enforcement efforts and the events leading up to the challenged decisions have been described in the Findings of Fact, above. There can be no serious dispute as to the bias of the angry and vocal neighbors of OH–JH and that their animosity was directed at OH–JH because of the residents' status as recovering alcoholics and drug addicts. There is also no question that their hostility was communicated on several occasions to various City officials, including the Mayor, the City Council, and Corporation Counsel, and that their opposition to OH–JH motivated the City not only to initiate but to continue its enforcement efforts. The Mayor himself acknowledged the "not in my backyard" attitude of the neighbors. The evidence at trial indicated that the City's enforcement of its Zoning Regulations, the Property Maintenance Code, and the State Building Code, was almost entirely complaint-driven. Thus, the City's enforcement efforts were at least tainted initially by the bias of the neighbors and citizens' filing complaints with the City. Additionally, it is significant that the City's relentless enforcement efforts against this group home were unprecedented.

### 3. The Sequence of Events

Almost immediately upon the City's commencing its enforcement efforts against OH–JH, City officials were put on notice of the potential implications of their actions under the FHAA and ADA by virtue of the lengthy and detailed letters from Van der Burgh and Polin. These exhaustive letters explained the Oxford House concept, as well as the applicability of the FHAA and ADA to Oxford House residents. They explained that, even though OH–JH might be in technical violation of a local zoning ordinance, that did not abrogate the rights of the residents under the FHAA or ADA. Additionally, the letters informed the City officials that unlawful discrimination under these federal statutes includes a failure or refusal to make reasonable accommodations, including a waiver of the zoning rules to afford persons with disabilities the same opportu-

nities to live in single-family neighborhoods as non-disabled persons.

The Mayor of New Haven also offered his opinion to Mayor Borer that these Oxford Houses were afforded special status under federal law. Nevertheless, with knowledge of the potential implications of their actions under the FHAA and ADA, City officials continued in their repeated citation of OH–JH for violations of the City Zoning Regulations, Property Maintenance Code, and Building Code.

### 4. Evidence of Bias by City Officials

Moreover, there was evidence of bias on the part of certain City employees and officials. Property Maintenance Code Official McCurry expressed his personal dissatisfaction with OH–JH to Ms. Tsombanidis. Additionally, the reason for his initial visit to OH–JH appears to have had nothing to do with building permit violations, as Ms. Tsombanidis later learned, but was precipitated by complaints about her use of the House as an Oxford House facility. McCurry also ordered Ms. Tsombanidis to evict the residents without any supporting authority in the City Code. The City claims that it should not be charged with the personal bias of McCurry, whom it characterizes as a "low level functionary without any policy-making authority." (City's Proposed Concl. of Law at 8, ¶ N.) However, this "low level functionary" is listed on the letterhead of the City of West Haven Building Department as one of two "Property Maintenance Code Official[s]," who apparently had the authority, and exercised the authority, to issue citations for violations of the Property Maintenance Code. Zoning Enforcement Official Evangelista also persisted in his enforcement efforts, issuing a second citation to Ms. Tsombanidis in March 1998, despite the repeated requests of OHI to hold these actions in abeyance pending a resolution of the FHAA and ADA issues. And, the Mayor himself, aware of the significant community bias and the fact that Oxford Houses as homes for recovering addicts might enjoy "special status" under federal law, permitted the enforcement efforts to continue.

Notwithstanding these repeated citations, the City argues that City officials took "no enforcement action, merely giving proper oral and written notices of the violations and of the possible consequences if enforcement were pursued." (City's Proposed Concl. of Law at 7, ¶ I.) Undoubtedly, no one would be more surprised than Ms. Tsombanidis to learn that neither the September 9 Order, requiring her to remove the illegal boarding house within ten days or face a $99.00/day fine, nor the ensuing citations, also threatening legal action for her failure to comply, were not "enforcement actions."

There is also evidence that Commissioner Hill had never previously, in his eleven-and-one-half years as Commissioner, attempted to force residents of an illegal boarding house out by inspecting it and enforcing the zoning regulations against it. Nevertheless, in response to the intense pressure from angry citizens and neighbors, the City, through various officials, sent Ms. Tsombanidis two letters and two citations for zoning violations, one notice of her violation of the Building Code, and one notice of violations of the Property Maintenance Code. Furthermore, the City's involvement of the Fire District in zoning matters was unprecedented.

Additionally, the Court finds evidence of bias against the OH–JH residents because of their handicap on the part of the members of the Zoning Board of Appeals. Because of the public nature of the hearing that would be involved if plaintiffs sought a special use exception from the Zoning Board of Appeals, plaintiffs initially

balked at the suggestion that this matter would have to be taken to the Zoning Board of Appeals. *See Tsombanidis,* 129 F.Supp.2d at 161. Ultimately, however, they did pursue a request for a special use exception, following this Court's decision that their reasonable accommodation claim was not ripe for judicial review. *See Id.* The Zoning Board of Appeals unanimously voted against a special use exception, ostensibly because the residents were not supervised by an outside professional and because the screening process for new residents was purely internal. However, no credible evidence was offered as to why the presence of a professional would facilitate OH–JH's ability to operate in a neighborhood of single-family residences. In fact, the Board had previously approved a special use exception for another residential facility for recovering alcoholics and drug abusers. There also was no persuasive evidence as to how the residents' screening process for new residents adversely impacted the make-up of the House. In fact, in the years that OH–JH has been operating, not a single resident has been charged with a crime. There was no evidence that allowing OH–JH to operate in this single-family district would jeopardize the public health, safety, or welfare of the neighbors, or that it would substantially impair or diminish property values in the neighborhood, or that it would adversely implicate any other concern traditionally considered by zoning boards of appeal. *See* Conn. Gen.Stat. § 8–6(a). Indeed, it appears to the Court that the presence of a professional or an outside screening process might detract from the residents' ability to operate OH–JH like a family.

Although the Zoning Board of Appeals had no legal duty to grant a special use exception (except to the extent that it was necessary to reasonably accommodate plaintiffs' handicap, discussed *infra* ), it could not deny this request because of the residents' handicapped status or because of the discriminatory animus of City officials or members of the community. The Court finds that the reasons proffered by the Zoning Board of Appeals for its denial of a special use exception for OH–JH were not credible and that these reasons, as stated, were a pretext for discrimination against the OH–JH residents because of their disability.

When these events and circumstances are viewed in their totality, the Court concludes that there is sufficient evidence to find that handicapped status of the OH–JH residents was a motivating factor in the City's enforcement efforts and in its denial of a special use exception to OH–JH. The City has failed to prove that it would have taken the same actions if it had not been motivated by an unlawful purpose. Accordingly, the Court holds that the City intentionally discriminated against plaintiffs in violation of the FHAA and the ADA.

## B. Adverse Impact Discrimination by the City

In addition, the Court finds that the City's enforcement of its Zoning Regulations, Property Maintenance Code, and Building Code had a disparate impact on plaintiffs.

Disparate impact claims are premised on facially neutral policies or practices that are adopted without a discriminatory motive but which, when applied, have a discriminatory effect on a group of individuals who enjoy protected status under the anti-discrimination laws. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–36 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). In order to establish a *prima facie* case of disparate impact

discrimination, plaintiffs must show that the challenged practice "actually or predictably" results in a greater adverse impact on a protected group than on others. *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. at 1182–83. Discriminatory intent need not be shown. *Huntington Branch, NAACP,* 844 F.2d at 934–36. Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* at 936 (internal quotations and citations omitted).[12] In the end, this Court must balance plaintiffs' showing of adverse impact against defendants' justifications for their conduct. *Corporation of the Episcopal Church in Utah v. West Valley City,* 119 F.Supp.2d 1215, 1219 (D.Utah 2000). Two factors that will weigh heavily in plaintiffs' favor are: (1) evidence of discriminatory intent on the part of defendants (although evidence of discriminatory intent is not required); and (2) evidence that plaintiffs are seeking only to require defendants to eliminate an obstacle to housing rather than suing to compel defendants to build housing (the former requiring a less substantial justification from defendant for its actions). *Id.*

We have already found that the City intentionally discriminated against plaintiffs in its enforcement efforts and denial of a special use exception to OH–JH. It is also undisputed that plaintiffs are seeking to have the City eliminate an obstacle to their ability to live in a single-family neighborhood rather than asking the City to take affirmative action to provide housing for them. Additionally, as discussed above, plaintiffs have demonstrated that the City's definition of "family" has a greater impact on groups of unrelated persons who are recovering alcoholics or drug abusers, seeking to live together in a single-family residential zone, than on non-handicapped individuals related by blood, marriage, or adoption.

■ Because of their disabilities, plaintiffs not only choose, but need, to live in a supportive group living arrangement in a residential neighborhood. Plaintiffs presented evidence that it was not economically feasible for OH–JH to operate with three or less residents. Plaintiffs have demonstrated that the City's inflexible enforcement efforts will have the effect of preventing them from living in a single-family neighborhood. Moreover, in order for the Oxford House concept to succeed in a group home setting, there need to be at least six residents and the house should be located in a single-family residential neighborhood, not in close proximity to areas where drugs and alcohol are readily available. Thus, the Court finds that the City's enforcement of the "single-family" provisions of its Zoning Regulations, Property Maintenance and Building Codes has an adverse impact on plaintiffs as handicapped individuals.

Numerous courts have held that facially neutral definitions of "family" in municipal zoning codes that result in the imposition of more stringent requirements on groups of unrelated persons living together have a greater adverse impact on disabled persons than non-disabled persons. *See Ox-*

---

**12.** The Court in *Huntington Branch, NAACP,* 844 F.2d at 939, held that, in considering the defendants' justifications, the Court should first consider whether there is a less discriminatory alternative. If there is no less discriminatory alternative, the Court should scrutinize the justifications proffered by the defendants to determine their legitimacy and *bona fide* good faith, by inquiring whether the reasons were of substantial concern such that they would justify a reasonable official in making this determination.

*ford House, Inc. v. Town of Babylon,* 819 F.Supp. at 1183; *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. at 462. In the *Cherry Hill* case, the Court held that "[b]ecause people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement such as the one Oxford House provides, in which groups of unrelated individuals reside together in residential neighborhoods for mutual support during the recovery process, Cherry Hill's application of this ordinance has a disparate impact on such handicapped people." 799 F.Supp. at 461.

In *Huntington Branch, NAACP,* 844 F.2d at 934, the Second Circuit directed that, in determining whether evidence of discriminatory effect is sufficient, the courts should look to the congressional purpose of the statute as gleaned from the legislative history. The 1988 Amendments to the Fair Housing Act were "intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special-use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." H.R.Rep. No. 100–711 at 24. This is precisely the adverse effect that will result from enforcement of the City's Zoning Regulations, Property Maintenance and Building Code.

In response, the City offered as a nondiscriminatory explanation for its action that plaintiffs were in violation of the various City codes and regulations. As noted above, however, these codes and regulations are not exempt from the FHAA and do not insulate the City from liability under the FHAA and ADA. Additionally, the City has failed to carry its burden of showing that no less restrictive alternative was available. The City presented no evidence that waiving the single-family requirement or granting plaintiffs a special use exemp-

tion would impose an undue financial or administrative burden on the City. The City advanced its legitimate interest in protecting the residential character of the surrounding neighborhood as a justification for enforcing the single-family Zoning Regulations. However, it offered no evidence that allowing OH–JH residents to occupy 421 Platt Street would effect a fundamental change in the nature of the neighborhood. Indeed, the evidence presented by plaintiffs was to the contrary and established that OH–JH functions in many respects like a single-family residence. Further, since the inception of OH–JH, not one of the residents has been charged with a crime.

The only other justification offered by the City was the Board of Zoning Appeals' concern that the residents did not have professional supervision and had no formal, outside selection process for admitting new residents. As discussed above, we give little credence to proffered explanations.

Accordingly, we hold that plaintiffs have carried their burden of showing that the City's enforcement of the single-family provisions in its Zoning Regulations, the Property Maintenance Code, and the Building Code has an adverse impact upon them as handicapped individuals. We also find that the City has failed to meet its burden of showing that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that there was no alternative which would serve that interest with less discriminatory effect. Therefore, we find in favor of plaintiffs on their FHAA and ADA claims against the City based upon a theory of adverse impact.

## C. The City's Failure to Provide A Reasonable Accommodation

Plaintiff's third alleged basis for liability under the FHAA and ADA is the

City's failure to provide them with a reasonable accommodation. Both the FHAA and Title II of the ADA place upon municipalities an affirmative duty to make reasonable accommodations in order to afford persons with disabilities the same housing opportunities as the non-disabled, so long as those accommodations are reasonable and do not place an undue financial or administrative burden on the municipality or require a fundamental alteration in the nature of the program. *See Southeastern Community College v. Davis,* 442 U.S. 397, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Bryant Woods Inn, Inc. v. Howard County,* 124 F.3d 597, 603 (4th Cir.1997) (recognizing the tension between the County's right to control land uses through neutral regulation and its duty to provide a reasonable accommodation to persons with handicaps). Additionally, the regulations promulgated under Title II of the ADA mandate a reasonable modification by a public entity "in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Olmstead v. L.C.,* 527 U.S. 581, 604, n. 16, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)(a plurality of the Court holding that Title II of the ADA, consistent with § 504 of the Rehabilitation Act, provides for a reasonable accommodation unless the accommodation would impose an undue hardship on the operation of its program); *Wisconsin Correctional Serv.,* at 852–54.

■ In ruling on a reasonable accommodation claim under the FHAA, the Court in *Smith & Lee Associates,* 102 F.3d at 794–95, looked at the legislative history of the amendments to the Fair Housing Act, noting that the underlying purpose of the amendments was to afford handicapped individuals the equal opportunity to live in single-family neighborhoods, should they choose to do so, and to end the unnecessary exclusion of persons with handicaps from the American mainstream. *See* 42 U.S.C. § 3604(f)(3)(B)("accommodation . . . necessary to afford . . . equal opportunity"). It also cited the statute's use of the term "necessary," which requires plaintiffs to show that but for the requested accommodation they likely will be denied an equal opportunity to enjoy the housing of their choice. *Smith & Lee Assocs.,* 102 F.3d at 795. Finally, the Court noted that in determining whether a requested accommodation is "reasonable," the statute's legislative history indicates that Congress intended courts to apply the line of decisions interpreting the phrase "reasonable accommodation" under Section 504 of the Rehabilitation Act. *Id.* Under those cases, an accommodation is reasonable, unless it requires "a fundamental alteration in the nature of a program" or imposes "undue financial and administrative burdens." *Id.* (citing *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)); *see also Bryant Woods Inn,* 124 F.3d at 603 (noting that the FHAA does not provide a "blanket waiver of all facially neutral zoning policies and rules," which would give the disabled "carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary.") Thus, the FHAA "requires an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Bryant Woods Inn,* 124 F.3d at 603.

■ In this case, the accommodation that plaintiffs requested was a special use exception that would allow OH–JH to operate in a single-family residential district.

As early as September 17, 1997, when Attorney Polin first wrote City officials explaining the Oxford House concept and requesting that the City hold in abeyance its enforcement of the citations that had been issued to Ms. Tsombanidis, OHI requested a "reasonable accommodation" for OH–JH. Without this accommodation, as discussed above, recovering alcoholics and drug abusers would not have the opportunity to live in a single-family neighborhood because of the number of residents necessary to make the Oxford House model functionally successful and economically feasible. However, plaintiffs did not formally request this accommodation through a request for a special use exception from the Zoning Board of Appeals until May 21, 2001, and, as noted above, this request was unanimously denied.

The Court finds that the requested accommodation was reasonable in light of the fact that OH–JH operates in a manner similar to a single-family residence and the residents' need to live in group homes located in single-family districts removed from the areas where persons in recovery can readily obtain drugs or alcohol. Moreover, the City's Zoning Regulations already treat unrelated persons as a single family so long as they are three or less in number and the Regulations impose no numerical limitations on the number of related persons who can live together in a single-family neighborhood. And, as noted above, there is no evidence that allowing OH–JH to operate in a single-family district will effect a fundamental change in the neighborhood.

The requested accommodation is also necessary for the plaintiffs' recovery, and, without this accommodation, the John Doe plaintiffs will be denied the opportunity to live in this type of group home.

The City failed to demonstrate that providing plaintiffs with this accommodation would impose any "undue hardship" or "substantial burden." Allowing seven unrelated Oxford House residents to live together in a house, which is operated much like any other single-family residence, will not fundamentally alter the nature of a single-family neighborhood and will not effect a "fundamental change" in the City's existing zoning. There is virtually no cost to the City associated with this requested accommodation. The City provided no evidence that these seven residents would impose a greater administrative or financial burden on the City in terms of the use of City or emergency services than a single family of related members. While certain City residents expressed safety concerns about having the Oxford House residents as neighbors, there was no proof that these residents pose any real threat to the safety of anyone. In fact, the proof was to the contrary, that none of residents had been arrested since the inception of OH–JH. *See ReMed Recovery Care Centers*, 36 F.Supp.2d at 683–84.

Thus, when the benefits of allowing recovering alcoholics and drug abusers to live in a single-family neighborhood are weighed against the financial and administrative burdens to the City, if any, it is clear that the benefits to plaintiffs far outweigh the burdens to the City. Accordingly, the Court holds that the City discriminated against plaintiffs by denying them their requested accommodation.

### D. Relief Requested

Having found the City liable to plaintiffs for violating Title II of the ADA and the FHAA, we turn to the question of the relief to be awarded plaintiffs against the City. In their complaint, plaintiffs seek a variety of relief from this Court. Specifically they ask the Court to:

1. Enter a permanent injunction restraining the City from taking actions ei-

ther directly or indirectly which would interfere in any way with plaintiffs' current occupancy of OH–JH;

2. Enter a declaratory judgment that the City has illegally discriminated against plaintiffs by arbitrarily and capriciously applying the State Building Code to the occupancy of 421 Platt Avenue by a group of recovering alcoholics and addicts, thereby interfering with the plaintiffs' equal opportunity to use and enjoy a dwelling on the basis of handicap, in violation of the Fair Housing Act;

3. Enter a permanent injunction enjoining the City of West Haven, its officers, employees, agents, attorneys and successors, and all persons in active concert or participation with any of them, from proceeding with the prosecution of OHI and Beverly Tsombanidis for alleged violations of the West Haven Zoning Regulations and/or Building Codes, or otherwise interfering with the rights of recovering alcoholics or substance abusers to reside at 421 Platt Avenue;

4. Enter an order declaring that plaintiffs' use of 421 Platt Avenue is consistent with classification of the premises as a single-family dwelling and requiring the City to apply all zoning, safety and building codes to plaintiffs' use of 421 Platt Avenue in the same matter as it does to all other single family dwellings;

5. Award compensatory damages;

6. Grant an award of reasonable costs and attorneys' fees; and

7. Grant any and other such other relief that the Court deems just and proper.

We begin by considering what relief is available to plaintiffs under the FHAA and Title II of the ADA. Under the FHAA, this Court

(A) may award such preventative relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation of this subchapter as is necessary to ensure the full enjoyment of the rights granted by this subchapter;

(B) may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved; and

(C) may, to vindicate the public interest, assess a civil penalty against the respondent -

(i) in an amount no exceeding $50,000 for a first violation; and

(ii) in an amount not exceeding $100,000, for any subsequent violation.[13]

42 U.S.C. § 3614(d)(1). Additionally, the Court has discretion to allow the prevailing party attorney's fees and costs. 42 U.S.C. § 3614(d)(2).

■■■ The specific relief available under Title II of the ADA is less straightforward. Title II specifically incorporates the remedial scheme set forth in 29 U.S.C. § 794a (the Rehabilitation Act of 1973). 42 U.S.C. § 12133. The Rehabilitation Act, 29 U.S.C. § 794a(a)(2),[14] in turn, incorporates the remedies set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Additionally, the Rehabilitation Act provides for the award of attorney's fees and costs to the prevailing party. 29 U.S.C. § 794a(b).) Although Title VI does not spell out the specific remedies that are available, it has been interpreted as including a judicially implied private right of action. *See Guardians Ass'n v. Civil Ser-*

---

**13.** Plaintiffs, however, have not requested that the Court impose a civil penalty under the FHAA.

**14.** 29 U.S.C. § 794a(a)(1) applies to employment cases and, thus, is inapplicable to this case.

*vice Comm'n, NYC*, 463 U.S. 582, 594–94, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Garcia v. SUNY Health Sciences Center of Brooklyn*, 280 F.3d 98, 110 (2d Cir.2001). Thus, by referencing Title VI's remedial scheme, Title II of the ADA has likewise been interpreted as incorporating an implied private right of action. *Garcia*, at *8. Although in the past there has been considerable disagreement among the courts as to whether monetary damages are available under Title II of the ADA, the Second Circuit has recently reaffirmed its earlier holding that a private plaintiff may recover monetary damages upon a showing of a statutory violation resulting from "deliberate indifference" to the rights secured the disabled by Title II. *Garcia*, at *11 (citing *Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir.1998), *vacated on other grounds by* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999)).

 In the instant case, we have found the City liable for intentional discrimination against plaintiffs. We based this finding in part on the personal animosity exhibited by certain City officials toward plaintiffs, the fact that community bias and complaints from angry citizens largely drove the City's enforcement efforts, and the unprecedented nature of the City's enforcement activities. Moreover, we noted that the City had repeatedly been put on notice that its actions were in violation of the ADA and FHAA and that plaintiffs were asking for a reasonable accommodation of their handicaps. Despite these notices and requests, the City continued to blindly pursue its enforcement efforts against Ms. Tsombanidis and OH–JH without any effort to ascertain the degree to which OH–JH operated like a single-family residence or the implications of its actions under the ADA and FHAA. Accordingly, we have no difficulty in holding that the City acted with "deliberate indifference" to the rights of plaintiffs under the ADA because of their status as disabled persons and that the City is liable for monetary damages as a result of this intentional discrimination. *See Bartlett*, 156 F.3d at 331.

 No evidence was presented at trial as to any monetary damages sustained by the John Doe plaintiffs. However, there was sufficient evidence presented at trial concerning emotional distress suffered by Ms. Tsombanidis for the Court to hold that these injuries were proximately caused by the discriminatory conduct of the City. It was Ms. Tsombanidis who was personally subjected to the discriminatory enforcement efforts by City officials. It was Ms. Tsombanidis who met with angry City officials and was directed to remove the residents within 24 hours, who was told by McCurry that he would not want these addicts in his backyard, who was subjected to the repeated citations for her illegal boarding house, who was threatened with criminal sanctions. As a proximate result of these discriminatory enforcement actions, Ms. Tsombanidis sustained emotional pain and suffering for which she is entitled to recover compensatory damages. The amount of these damages is a matter left to the sound discretion of the trial court. Having observed her demeanor at trial and after hearing her testimony, the Court finds that $1,000 is fair and adequate compensation for the emotional pain and suffering that she sustained.

 There was also proof at trial of out-of-pocket expenses of $900 incurred by OHI for travel and lodging to send Mr. Malloy to testify at the trial. The Court does not consider the expenses incurred by OHI as travel and lodging for its Chief Executive Officer as appropriate elements of compensatory damages. OHI also provided evidence of time spent by Mr. Mal-

loy and another OHI employee in addressing this dispute with the City. The Court may award compensatory damages to an advocacy group such as OHI upon proof that the time spent on this matter resulted in a diversion of resources from other matters, or, impaired its ability to facilitate work in other areas. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 21, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F.Supp.2d 456, 465 (D.Md.2000). The Court is not persuaded that such "diversion of resources" damages are appropriate as to the time spent by Molly Brown, an employee of OHI. However, the Court will award OHI as compensatory damages $36,073.88, for the 541 hours spent by Chief Executive Officer Malloy from September 1997 through October 2001, on this matter. Obviously, by virtue of Chief Executive Officer Malloy's involvement with the OH–JH dispute, he was unable to spend time on other matters. OHI has adequately segregated time spent on this specific matter from other matters involving Oxford Houses. Furthermore, the Court finds that the number of hours claimed by OHI for his work over a four-year period is reasonable and necessary.

■■■ Plaintiffs have requested that we enter a permanent injunction restraining the City from taking actions either directly or indirectly which would interfere in any way with plaintiffs' current occupancy of OH–JH. This, the Court declines to do. That request is far too broad. Nevertheless, finding that plaintiffs have shown that they will suffer irreparable harm absent a more limited permanent injunction, the Court permanently enjoins the City of West Haven, its officers, employees, agents, attorneys and successors and all persons in active concert or participation with any of them, from proceeding with the prosecution of OH–JH, OHI, and/or Beverly Tsombanidis for violations of the West Haven Zoning Regulations, the Building Code, and the Property Maintenance Code, insofar as those violations relate to or arise out of the number of recovering alcoholics or former drug users (not to exceed a total of seven in number) residing at OH–JH. The Court further finds that plaintiffs' current use of the premises at 421 Platt Avenue with seven or fewer residents is consistent with classification of the premises as a single-family dwelling and orders the City to apply and enforce its Zoning Regulations, Building Code, and Property Maintenance Code against OH–JH in the same manner that it does for all other single-family dwellings. Finally, the Court awards attorney's fees and costs to all plaintiffs against the City, in an amount to be determined after further briefing by all parties.

## II. PLAINTIFFS' CLAIMS AGAINST THE FIRST FIRE DISTRICT

As discussed above, the discrimination claims against the First Fire District that went to trial were adverse impact discrimination and the Fire District's failure to provide a reasonable accommodation under Title II of the ADA and under the FHAA.

### A. Adverse Impact Discrimination by the First Fire District

In order to establish a *prima facie* case of disparate or adverse impact discrimination by the Fire District, plaintiffs must show that the challenged practices of the Fire District actually resulted, or predictably result, in a disproportionate burden on them as members of a protected class. *See Tsombanidis*, 129 F.Supp.2d at 155. In this case, plaintiffs challenged the Fire District's application of the facially neutral provisions of the State Fire Code relating to lodging and rooming houses to OH–JH,

as opposed to the one-family dwelling provisions.

█ Plaintiffs produced evidence that the requirements of the Fire Safety Code for lodging and rooming houses, including the installation of larger, escape windows in every bedroom, enclosing an interior stairwell with fireproof materials, installing fire alarm and automatic sprinkler systems throughout the house, and smoke detectors with visible alarms, were prohibitively expensive for OH–JH and that the continued enforcement of these provisions would result in the constructive eviction of the John Doe plaintiffs from this one-family dwelling and would limit the housing opportunities available to Oxford House residents. Plaintiffs have also produced substantial evidence of their need to live in a group home setting in a residential neighborhood, in order to facilitate their continued recovery from alcoholism and drug addiction. This is a need that non-handicapped persons do not share to the same degree and, thus, non-handicapped persons would not be impacted as greatly in terms of their housing opportunities as Oxford House residents. *See Huntington Branch, NAACP*, 844 F.2d at 938 (finding adverse impact in City's rezoning decision based upon percentage of minorities who required subsidized housing as compared to overall percentage of town residents requiring subsidized housing). Thus, we find that plaintiffs have made a *prima facie* showing that enforcement of the Fire Safety Code's lodging and rooming house provisions has an adverse impact on them as handicapped individuals.

The burden then shifts to the Fire District to show that its actions furthered in theory or practice a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect. *Huntington Branch, NAACP,* 844 F.2d at 936. The

Fire District argues that it does not have the legal authority to interpret, modify, or vary the requirements of the State Fire Safety Code. Additionally, it points to its legitimate interest in protecting the lives and property of the residents and their neighbors.

Plaintiffs respond that they do not dispute that the safety of residents and neighbors is a bona fide governmental interest, but the Fire District has not shown, and cannot show, that this interest cannot be served in a less discriminatory manner. They point to the fact that neither the Fire District nor the Deputy State Fire Marshal ever ascertained the level of fire safety at OH–JH or the degree of communication between the residents or the accessibility of all portions of the House to the residents. As to the Fire District's lack of discretion to interpret or modify the Fire Safety Code, plaintiffs assert that Spreyer interpreted the Code when he first determined in December, 1997, that the six residents of OH–JH could not be considered a one-family occupancy. They also cite to the fact that Deputy State Fire Marshal Peabody threw the issue of compliance with the FHAA back in Spreyer's lap, advising him to consult with Corporation Counsel on that matter.

To a certain degree, this controversy with the Fire District has become moot because of the concession at trial of Deputy State Fire Marshal John Blaschik that under the newly amended Fire Safety Code, the seven residents of OH–JH could be treated as a single family, with one resident as the "family" and the other unrelated residents as his six guests. However, that concession does not moot the claims of plaintiffs relating to the Fire District's enforcement efforts over the three-year period from 1998 until trial, nor does it moot their claims for relief. Moreover, the Court is not persuaded by the

Fire District's excuse that it did not have the power to modify the Fire Safety Code. *See Wisconsin Correctional Serv.*, at 852. The Fire District cannot exempt itself from the requirements of the ADA and the FHAA in this manner. *See Id.* (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S.Ct. 1879, 1896, 149 L.Ed.2d 904 (2001) (rejecting PGA's argument that it could not consider granting an exception to its rules because the rules did not provide for exceptions)). As the Court in *Wisconsin Correctional Service* noted, to allow a municipal or state entity to exempt itself on this basis would allow it to avoid compliance with the ADA altogether.

Accordingly, the Court finds that the Fire District's application and enforcement of the lodging and boarding provisions of the Fire Safety Code as to OH–JH had a discriminatory impact on plaintiffs on the basis of their disability. The Court further holds that the Fire District has failed to prove that there was no alternative that would serve its legitimate interests in fire safety and have a less discriminatory impact on plaintiffs. *See Civic Ass'n of Deaf of New York City v. Giuliani*, 915 F.Supp. 622, 633 (S.D.N.Y.1996); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730–31 (9th Cir. 1999). Therefore, the Court holds that the Fire District's application of the lodging and boarding house provisions to OH–JH had an adverse impact on plaintiffs because of their handicap, in violation of the FHAA and Title II of the ADA.

### B. The Fire District's Failure to Provide Reasonable Accommodation

■ The other theory advanced by plaintiffs against the Fire District is that it failed to provide them with the reasonable accommodation of treating OH–JH as a one-family residence, which would allow it to operate without the need for the modifications required of lodging and rooming houses. This Court initially held that plaintiffs' reasonable accommodation claim against the Fire District was not ripe for adjudication because plaintiffs had not sought a variation or exemption from the State Fire Marshal, pursuant to Conn. Gen.Stat. § 29–296.[15] *See Tsombanidis*, 129 F.Supp.2d at 160–61. However, as noted, Deputy State Fire Marshal Blaschik testified at trial that OH–JH would be considered a one-family dwelling and would be treated accordingly, thus obviating the need for plaintiffs to apply for that exemption.

Therefore, so long as the Fire District adheres to its representation that it will apply the one-family dwelling provisions to OH–JH, there is no need for plaintiffs to pursue their request for an exemption from the State Fire Marshal. Because the Fire District never rejected plaintiffs' request for an accommodation, this Court finds that there was no violation of the reasonable accommodation provisions of the FHAA and ADA by the Fire District.

### C. Relief Against the Fire District

Again, plaintiffs have sought various forms of relief against the Fire District. In their complaint, they request that this Court to

1. Enter a permanent injunction restraining the Fire District from taking actions either directly or indirectly which

---

**15.** Section 29–296, Conn. Gen.Stat., provides that the State Fire Marshal may grant variations or exemptions from any regulation issued pursuant to the Fire Safety Code, where strict compliance would entail practical difficulty or unnecessary hardship or is adjudged unwarranted, provided that any such variation or exemption shall, in the opinion of the State Fire Marshal, secure the public safety.

would interfere in any way with plaintiffs' current occupancy of OH–JH;

2. Enter a declaratory judgment that the Fire District has illegally discriminated against plaintiffs by arbitrarily and capriciously applying the Connecticut Fire Safety Code to the occupancy of 421 Platt Avenue by a group of recovering alcoholics and addicts, thereby interfering with the plaintiffs' equal opportunity to use and enjoy a dwelling on the basis of handicap, in violation of the Fair Housing Act;

3. Enter a permanent injunction enjoining the Fire District, its officers, employees, agents, attorneys and successors, and all persons in active concert or participation with any of them from proceeding withe prosecution of OHI and Beverly Tsombanidis for alleged violations of the Connecticut Fire Safety Code, or otherwise interfering with the rights of recovering alcoholics or substance abusers to reside at 421 Platt Avenue;

4. Enter an order declaring that plaintiffs' use of 421 Platt Avenue is consistent with classification of the premises as a single-family dwelling and requiring the Fire District to apply all fire codes to plaintiffs' use of 421 Platt Avenue in the same manner as it does to all other single family dwellings;

5. Award compensatory damages;

6. Grant an award of reasonable costs and attorneys' fees; and

7. Grant any and other such other relief that the Court deems just and proper.

 We have already addressed the statutory basis for relief under the FHAA and Title II of the ADA. The Fire District argues that plaintiffs are not entitled to compensatory damages for emotional distress injuries, citing to the common-law standard for awarding damages for emotional distress in state tort claims. These cases are inapplicable to the question of recoverable statutory damages under these two federal acts. *Dollard v. Board of Education of the Town of Orange,* 63 Conn.App. 550, 777 A.2d 714 (2001), and *Petyan v. Ellis,* 200 Conn. 243, 510 A.2d 1337 (1986), involved a state common-law causes of action for negligent and intentional infliction of emotional distress, claims that are not present in the instant case.

The primary consideration that distinguishes the relief to be awarded to plaintiffs against the Fire District, from that awarded against the City, is the fact that this Court has made no finding of intentional discrimination by the Fire District.

 Accordingly, the Court holds that plaintiffs are not entitled to an award of compensatory damages against the Fire District. The Court further holds that plaintiffs are entitled to recover reasonable attorney's fees in an amount to be determined after further briefing. Additionally, the Court permanently enjoins the First Fire District, its officers, employees, agents, attorneys and successors and all persons in active concert or participation with any of them, from proceeding with the prosecution of OH–JH, OHI, and/or Beverly Tsombanidis for violations of the State Fire Safety Code, insofar as those violations relate to or arise out of the number of recovering alcoholics or former drug users (not to exceed a total of seven in number) residing at OH–JH. The Court further finds that plaintiffs' current use of the premises at 421 Platt Avenue with seven or fewer residents is consistent with classification of the premises as a one-family dwelling and orders the Fire District to apply and enforce the Fire Safety Code against OH–JH in the same manner that it does for all other one-family dwellings.

## CONCLUSION

The Court directs the Clerk to enter Judgment in favor of the plaintiffs, John Does One through Seven, Beverly Tsombanidis, and Oxford House, Inc., against the City of West Haven and the First Fire District of West Haven in accordance with the Relief provisions in the Conclusions of Law, set forth above. Plaintiffs are directed to submit appropriate documentation of their attorney's fees and costs within 30 days of the date of this ruling. In so doing, counsel are directed to allocate their fees and costs, to the extent possible, between defendants. Defendants shall have 21 days to file any opposition to plaintiffs' request for attorney's fees and costs. Thereafter, plaintiffs shall have ten days to file a reply, if they deem one necessary.

SO ORDERED.