**START, INC.,**

v.

**BALTIMORE COUNTY, MARYLAND, et al.**

No. CIV.A. CCB–03–2051.

United States District Court, D. Maryland.

Dec. 17, 2003.

## MEMORANDUM

BLAKE, District Judge.

This lawsuit involves efforts by the plaintiff, START, Inc. ("START"), to open a methadone clinic for recovering opiate addicts in Baltimore County, Maryland. Having been denied an essential zoning permit, START brought suit against Baltimore County, the Baltimore County Department of Permits and Development Management ("Permits Department"), the Office of the Zoning Commissioner of Baltimore County ("OZC"), and the County Council of Baltimore County ("County Council") alleging violations of Titles II and IV of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132–33, 12203, and the Due Process Clause of the Fourteenth Amendment. The defendants have filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket no. 6.) The motion has been fully briefed and no oral argument is necessary. *See* Local Rule 105.6. For the reasons that follow, the court will grant the motion with respect to count three of the complaint (the Due Process claim), but deny it with respect to counts one and two (the ADA claims).

## BACKGROUND

Because this is a motion to dismiss, the court must accept the plaintiff's factual allegations, as well as all reasonable inferences therefrom, as true, and must view the complaint in the light most favorable to the plaintiff.[1] *See Mylan Labs., Inc. v.*

Vicki L. Dexter, Irwin, Green and Dexter LLP, Towson, MD, for Plaintiff.

Jeffrey Grant Cook, Baltimore County Law Department, Towson, MD, for Defendant.

---

1. The court notes and deplores the hyperbolic and intemperate language of some portions of Baltimore County's brief: *e.g.,* "residents who live in a community, when apprised that a methadone clinic may open, can—without undertaking scientific analysis—oppose the idea simply on the basis that the clientele who have abused heroin have engaged in numerous illegal acts and other opprobrious behavior" (Def.'s Mot. at 15); "it takes a certain quality, so to speak, to want to inject yourself with something worse than lighter fluid" (Def.'s Reply at 9); "It is these people (the self-inflicted disabled who ignore laws) that Baltimore County is to embrace into their neighborhoods" (*Id.*).

*Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993); *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992); *Westray v. Porthole, Inc.,* 586 F.Supp. 834, 836 (D.Md. 1984).

According to the complaint, START is a Maryland corporation that was formed in the summer of 2001. (Compl.¶¶ 1, 31.) Baltimore County is a municipality incorporated under Maryland law. (*Id.* ¶ 2.) The County Council has authority to pass zoning ordinances and other regulations that govern residents of Baltimore County (*id.* ¶ 5), while the Permits Department bears responsibility for administering zoning regulations, issuing permits, and regulating development within the county (*id.* ¶ 3). The OZC is a component of the Permits Department that, among other things, issues zoning permits and conducts hearings on disputed zoning matters. (*Id.* ¶ 4.)

START "was formed for the purpose of providing methadone maintenance services to individuals with opiate addiction, in conjunction with counseling and therapy, through the organization and operations of methadone clinics in the County of Baltimore, Maryland." (*Id.* ¶ 1.) Methadone maintenance therapy is a proven method of treating heroin dependence; for some individuals, it is the only effective treatment. (*Id.* ¶ 17.) Despite an "escalating heroin problem" (*id.* ¶¶ 16), only one methadone treatment program was located in Baltimore County as of the times relevant to the complaint (*id.* ¶ 18), and county officials, including the County Executive and the Director of the Baltimore County Bureau of Substance Abuse, expressed opposition to additional programs in their jurisdiction (*id.* ¶¶ 20–21). As of Fiscal Year 1996, less than 25% of the 980 Baltimore County residents receiving methadone treatment obtained it at facilities located in the county. (*Id.* ¶ 29.)

In August 2001, START signed a long-term lease for office space at the address 110 Reisterstown Road in Baltimore County. (*Id.* ¶ 32.) The zoning designation of this location, under the Baltimore County Zoning Regulations ("BCZR"), is "BR–AS" (business roadside, automotive service), which permits a wide range of business uses. (*Id.* ¶¶ 33–34.) "Offices," including "medical offices," may operate "as of right" in BR zones. (*Id.* ¶ 35.) The BCZR defines a "medical office" as a "place for the treatment of outpatients by one or more medical practitioners," meaning a "physician, dentist, optometrist, chiropractor, podiatrist, psychologist, physical therapist, nurse, or other similar health professional licensed by the state." (*Id.* ¶¶ 36–37 (internal quotation marks omitted).) "Medical clinics," which the BCZR defines as "ambulatory care centers, diagnostic centers, birthing centers, and dialysis satellite units," may also operate as of right in a BR zone. (*Id.* ¶ 38.) START planned to staff its facility with "licensed nurses to dispense methadone, a licensed physician to serve as the medical director and to conduct examinations, a doctor of psychology to serve as clinical director, and counselors." (*Id.* ¶ 39.)

Operating a methadone facility in Maryland requires certification by the state Department of Health and Mental Hygiene ("DHMH"), which is in turn contingent upon approval by federal regulators and documentation that the proposed facility involves a permitted use under the local zoning code. (*Id.* ¶ 23–24.) Since 1993, Baltimore County and the DHMH have followed a "consultation/approval procedure"—applied to no other type of facility—according to which the DHMH will not certify any methadone clinic without consulting with local government officials and receiving their approval. (*Id.* ¶ 25–26.) Accordingly, START began the certification process by contacting the Baltimore

County Permits Department. (*Id.* ¶¶ 42–43.) Carl Richards, a staff member at the Department, informed START that methadone clinics were not permitted in Baltimore County and urged START not to seek a permit for the Reisterstown Road facility. (*Id.* ¶ 43.) When START went ahead and applied, the Permits Department stalled its application, imposing the "unusual requirement of a full scale drawing with seal" and misplacing START's parking plan, a required element of the application, on three separate occasions. (*Id.* ¶¶ 44, 49.) The Permits Department eventually "rescinded" the application based on the loss of the parking plan. (*Id.* ¶ 50.)

In the meantime, a "firestorm of opposition" erupted in the local community. (*Id.* ¶ 45.) As one civic association put it, "The residents of Pikesville [the community surrounding the Reisterstown Road location] are outraged and demand that our elected officials protect our children, families, homes, businesses, and property values by preventing these dangerous and unwelcome drug treatment centers from establishing themselves in our community." (*Id.*) Certain "community activists" published the business and home address of START's landlord and urged a boycott of businesses associated with START. (*Id.* ¶ 47.) Kevin Kamenetz, a member of the County Council, wrote to two state senators urging them to take action against the proposed facility. (*Id.* ¶ 46.) He also criticized the landlord for renting to a "less desirable tenant" and forgoing "development opportunities" that Mr. Kamenetz had previously referred to the landlord. (*Id.*) Mr. Kamenetz appears to have been in contact with the Permits Department during this period, as he learned of the rescission of START's application before START did. (*Id.* ¶ 51.)

On April 1, 2002, Mr. Kamenetz introduced Bill No. 39–02 in the County Council to require that "state-licensed medical clinics," including methadone clinics and drug and alcohol treatment centers, (1) undergo a hearing and obtain a "special exception" before locating in an area zoned for business use; (2) locate at least 750 feet away from any residentially zoned property line; and (3) provide off-street parking. (*Id.* ¶ 55, Ex. A.) The County Council passed the bill on April 15, 2002 and it became effective on April 16, 2002. (*Id.* ¶ 55.) Though the bill defined "state-licensed medical clinics" to include facilities other than methadone clinics, START alleges that "it was readily apparent . . . that methadone clinics were the target and that no other types of clinics would be affected by the bill." (*Id.*) Based on Mr. Kamenetz's admission that "[w]e cannot treat a methadone clinic differently from any other medical clinic for the zoning process" (*id.* ¶ 52), START contends that the inclusion of non-methadone facilities in the new ordinance was a pretext to avoid liability under the ADA (*id.* ¶¶ 52, 55).

The Reisterstown Road location did not meet the requirements of Bill No. 39–02, so START's failure to obtain a permit before the new law became effective on April 16, 2002 prevented it from opening the planned clinic. (*Id.* ¶¶ 55, 63, 64.) Attempts to identify a comparable location failed, and START "lost the services of key employees." (*Id.* ¶ 60.) START alleges monetary losses including: lost profits; rents, utilities, and insurance fees based on the Reisterstown Road lease; expenditures on improvements to the Reisterstown Road site; costs associated with hiring and retaining staff for the proposed facility; and expenses associated with this litigation. (*Id.* ¶ 67.) Based on the three counts of its complaint, START seeks compensatory damages in the amount of $5,000,000; punitive damages in the amount of $2,000,000; a declaration that the defendants' actions violated the ADA; and permanent injunctions banning both

further discrimination against START and the administration of regulations or policies that have the effect of excluding methadone treatment facilities from the county or imposing special burdens on such facilities. (*Id.* at ¶ 21.)

START is not the first methadone program to encounter difficulty obtaining permits to operate in Baltimore County. In previous litigation, this court granted summary judgment in favor of a methadone treatment facility alleging violations of the ADA by Baltimore County. *Smith Berch, Inc. v. Baltimore County,* 115 F.Supp.2d 520 (D.Md.2000) ("*Smith Berch II*"); *see also Smith–Berch, Inc. v. Baltimore County,* 68 F.Supp.2d 602 (D.Md.1999) ("*Smith– Berch I*") (granting in part and denying in part a motion for summary judgment by the defendants).[2] An ADA suit by a third methadone clinic, Helping Hand, LLC, is now pending before the court, *see A Helping Hand, LLC v. Baltimore County,* No. CCB–02–2568 (D. Md. filed Aug. 2, 2002), and a fourth clinic, Jacob's Ladder Health Services, Inc., apparently failed in its efforts to open a clinic in 1998 (Compl.¶ 28). The Awakenings Drug Treatment Program ("Awakenings"), the one methadone clinic that existed in Baltimore County when START applied for the Reisterstown Road permit, operates under the auspices of the Baltimore County Health Department and is a "public-private hybrid" (*id.* ¶ 18), whereas START is a private for-profit company.

## ANALYSIS

■ "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). A motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989). Because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994); *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995) (affirming Rule 12(b)(6) dismissal with prejudice because plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law); *Faulkner Adver., Inc. v. Nissan Motor Corp.,* 945 F.2d 694, 695 (4th Cir.1991) ("self-serving, inaccurate legal conclusions cannot rescue a factually deficient complaint").

Applying this standard to this case, the allegations in START's complaint state a viable claim under the theories of counts one and two, but are legally insufficient to state a claim for which relief may be granted under count three.

## I. ADA Title II

■ Count one alleges violations of Title II of the ADA, which mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to dis-

---

2. The court later enjoined enforcement of the very ordinance at issue in this case, Bill No. 39–02, but the Fourth Circuit vacated the injunction on grounds that the court's prior order had failed to indicate with sufficient clarity that injunctive relief had been imposed. *See Smith–Berch, Inc. v. Baltimore County,* 216 F.Supp.2d 537 (D.Md.2002) ("*Smith–Berch III*"), *rev'd,* No. 02–2074, 64 Fed.Appx. 887, 2003 WL 21153346 (4th Cir. May 20, 2003) (unpublished disposition).

crimination by any such entity." 42 U.S.C. § 12132. Numerous precedents establish that the administration of zoning laws is a "service, program, or activity" within the meaning of the statute. *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45–46 (2d Cir.) ("RECAP"), *cert. denied*, 537 U.S. 813, 123 S.Ct. 74, 154 L.Ed.2d 16 (2002); *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir.1999) ("*BAART*"); *Wis. Corr. Serv. v. City of Milwaukee*, 173 F.Supp.2d 842, 851 (E.D.Wis.2001); *cf. Smith–Berch I*, 68 F.Supp.2d at 618 (noting an absence of dispute as to whether Title II applies to zoning decisions); *but see United States v. City of Charlotte*, 904 F.Supp. 482, 484 (W.D.N.C.1995) ("[A] zoning decision does not constitute a service, program, or activity of a municipality."). Indeed, several courts, including the District of Maryland, have upheld Title II claims based on facts similar to those alleged here. *See, e.g., Smith Berch II*, 115 F.Supp.2d at 521 (challenge by methadone clinic to county zoning policy); *Pathways Psychosocial v. Town of Leonardtown*, 133 F.Supp.2d 772, 786–88 (D.Md.2001) ("*Pathways II* ") (challenge by mental health facility to denial of occupancy permit); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 328 (6th Cir.2002) (challenge by methadone clinic to denial of zoning permit); *BAART*, 179 F.3d at 727–28 (challenge by methadone clinic to emergency zoning change after permit was issued); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 40 (2d Cir.1997) (challenge by drug and alcohol treatment center to denial of building permit); *Habit Mgmt., Inc. v. City of Lynn*, 235 F.Supp.2d 28, 28 (D.Mass.2002) (challenge by drug and alcohol treatment center to zoning ordinance); *Tsombanidis*

*v. City of West Haven*, 180 F.Supp.2d 262, 284–89 (D.Conn.2001) (challenge by group home for recovering alcoholics and drug addicts to administration of zoning laws and other municipal regulations). Nevertheless, the defendants argue for dismissal of START's Title II claim on five grounds: (1) START's allegations do not establish that its prospective patients were "disabled" under the statute; (2) the patients were not "qualified" to receive the zoning permit they seek; (3) the new zoning ordinance, Bill No. 39–02, complies with regulations under the ADA and thus does not violate Title II; (4) even if the complaint stated a claim, none of the named defendants would be proper except Baltimore County itself; and (5) the only relief Title II affords to parties such as START is declaratory. None of these arguments are persuasive.

### A. START's Prospective Patients

■ Although Title II prohibits discrimination only against "individual[s] with a disability," 42 U.S.C. § 12132, START has standing to pursue a claim if it suffered discrimination due to its plans to treat disabled individuals. *See, e.g., RECAP*, 294 F.3d at 46 n. 2; *MX Group*, 293 F.3d at 332–36; *Innovative Health Sys.*, 117 F.3d at 46–48; *cf. Smith–Berch I*, 68 F.Supp.2d at 618 (noting standing was undisputed). Under the ADA, an individual is disabled if he or she suffers from "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Although there is no question that opiate addiction may qualify as an "impairment" provided the addict is not currently using drugs,[3] *see, e.g.,*

---

**3.** The statute excludes individuals who are "currently engaging in the illegal use of drugs" from the category of "individual[s] with a disability" under the ADA. 42 U.S.C.

§ 12210(a). The Fourth Circuit has interpreted this provision to allow claims only if the purportedly disabled individual has ceased us-

Shafer v. Preston Mem'l Hosp. Corp., 107 F.3d 274, 280 (4th Cir.1997) (noting that "persons who have refrained from using drugs for some time are protected under the [ADA]"); MX Group, 293 F.3d at 336; Innovative Health Sys., 117 F.3d at 48; cf. Smith–Berch I, 68 F.Supp.2d at 617–18 (indicating an absence of dispute on this issue), the defendants argue that the allegations here do not indicate limitations in major life activities with the particularity required by Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which holds that "[i]t is insufficient for individuals attempting to prove disability status [under § 12102(2)] to merely submit evidence of a medical diagnosis of impairment."

While a more specific showing might be required to prevail at trial or withstand summary judgment, START's allegations are adequate at this stage. Reading the complaint in the light most favorable to START, as the court must, the allegations support the inference that START's prospective patients satisfied at least the second, if not the first, definition of disability under the ADA. Indeed, as the Sixth Circuit observed in another methadone clinic's ADA case, to dismiss claims "on the basis that an individualized inquiry of a client is needed would defy reason," considering that the alleged misconduct is the reason why START has no individual patients to present. MX Group, 293 F.3d at 336. Recognizing the difficulty of presenting more specific evidence in such circumstances, the Sixth Circuit upheld a lower court's finding of disability in a bench trial based mainly on evidence that narcotics addiction "necessarily include[s] impairments as to employability, parenting, and functioning in everyday life." Id. at 338

ing drugs "for some time." See Shafer v. Preston Mem'l Hosp. Corp., 107 F.3d 274, 280

(internal quotation marks and alterations omitted). Similarly, in RECAP, the Second Circuit concluded that alcoholics living in a proposed halfway house would have been disabled, though no individual patient was presented, because the "inability to live independently without suffering a relapse" would have been a requirement of residency in the house and "caring for one's self" is a major life activity. 294 F.3d at 47–48. By the same token, it is reasonable to assume in this case, at least for purposes of the motion to dismiss, that the heroin addicts START would have treated—individuals who, in some cases, required methadone therapy as the "only effective treatment" (Compl.¶ 17)—were limited in their ability to work, raise children, care for themselves, and function in everyday life, or at a minimum that they had a "record" of such impairments. Cf. RECAP, 294 F.3d at 48 (noting that recovering alcoholics who "need [the] supportive environment" of a halfway house "would qualify under the second [definition of a disability] because they have a record of having an impairment").

Accordingly, it is impossible to conclude as a matter of law that START's patients were not disabled, and count one of the complaint will not be dismissed on that basis.

## B. The Significant Risk Exception

■ The defendants' next argument is that START's patients were not "qualified" to receive the zoning permit even if they were "disabled" under the statute. The Fourth Circuit has interpreted the phrase "qualified individual with a disability" in § 12132 to exclude persons who pose "a significant risk to the health or safety of others by virtue of the disability that can-

(4th Cir.1997).

not be eliminated by reasonable accommodation." *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 (4th Cir. 1995). Relying on general statements about heroin dependence and crime in an eighteen-year-old work by James Q. Wilson, a leading criminology scholar,[4] the defendants argue that the risk of crime associated with drug addiction disqualifies START from the protection of Title II.

■ Although several courts have applied the "significant risk" test to the dangers associated with methadone clinics, *see, e.g., BAART,* 179 F.3d at 735–37; *Habit Mgmt.,* 235 F.Supp.2d at 29; *cf. Wis. Corr. Serv.,* 173 F.Supp.2d at 854 (noting that whether a mental health clinic's patients posed a significant risk was the "most significant" evidence in determining whether they were qualified individuals with disabilities), the defendants' assertions do not remotely approach the showing that would be required to establish such a risk in this case. The "significant risk" test is a "fact-intensive determination." *Montalvo v. Radcliffe,* 167 F.3d 873, 877 (4th Cir.1999) (internal quotation marks omitted). It requires consideration of four factors, namely, the nature, duration, and severity of the risk, and the probability that the potential injury will occur. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Montalvo,* 167 F.3d at 877. A court applying the test "must not base its calculus on stereotypes or generalizations about the effects of a dis-

ability but rather must make 'an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence.'" *Montalvo,* 167 F.3d at 876–77 (quoting 28 C.F.R. § 36.208(c)); *see also Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (noting that "the risk assessment must be based on medical or other objective evidence" and that even a good-faith belief that the risk is severe will not remove liability under the ADA). Based on these stringent requirements, establishing a significant risk in this case would require specific evidence of "severe and likely harms to the community that are directly associated with the operation of the methadone clinic."[5] *BAART,* 179 F.3d at 736–37. Generalities about the criminal behavior of heroin addicts such as the defendants have presented simply will not satisfy the standard. *Cf. Doe v. County of Centre,* 242 F.3d 437, 449 (3d Cir.2001) (criticizing the district court's reliance on "a bland and generalized set of statistics, lacking in individual specificity").

In any event, given that START's complaint includes no indication of a realistic threat to the community, it is impossible to conclude in the context of a motion to dismiss that START's patients posed any serious risk at all, let alone a risk that was significant and could not be managed by a reasonable accommodation. Indeed, based on the allegations in the complaint, the most reasonable assumption is that metha-

---

4. The defendants quote extensively from James Q. Wilson, *Thinking About Crime* (1985), referring to it as "the best available objective evidence" on this issue. (Def.'s Mot. at 10.) The accuracy of this description is debatable.

5. Though some courts hold that the defendants bear the burden of proving a significant risk, *see, e.g., Dadian v. Village of Wilmette,* 269 F.3d 831, 840–41 (7th Cir.2001), the

Fourth Circuit has required a plaintiff to prove he was otherwise qualified in the context of a claim of employment discrimination under Title I of the ADA, *see Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 197 (4th Cir.1997). Even assuming START will bear the burden on this issue, however, it is impossible to conclude, as would be required to grant a motion to dismiss, that no reasonable jury could find in favor of START based on the allegations in the complaint.

done treatment, the therapy START hoped to offer, may control the risks of crime just as it controls the underlying addiction that supposedly produces them. Consequently, this theory, too, is not a basis for dismissing count one under Rule 12(b)(6).

## C. ADA Regulations

Having concluded that START's patients may be deemed both "disabled" and "qualified" based on the allegations in the complaint, I must now address the defendants' suggestion that their actions were not discriminatory because they "complied" with applicable regulations under the ADA. This argument is entirely without merit.

■ To begin with, the defendants are wrong to suggest that compliance with the two regulations they cite, 28 C.F.R. §§ 35.150(a) and 35.130(b)(4), may afford a defense to liability under the ADA. Neither of these provisions is a regulatory safe harbor. To the contrary, these provisions themselves express restrictions that "effectuate" Title II's prohibition against "discrimination on the basis of disability by public entities," 28 C.F.R. § 35.101, and the regulations state explicitly that their provisions do not "invalidate or limit the remedies, rights, and procedures of any other Federal laws ... that provide greater or equal protection for the rights of individuals with disabilities or individuals associated with them," *id.* § 35.103(b).

In addition, neither of the two provisions is relevant to municipal zoning. The first, 28 C.F.R. § 35.150(a), falls within a section entitled "Existing Facilities" and governs the accessibility of a public entity's services, programs, and activities to individuals with disabilities. This provision might apply if, for example, no doorway to the buildings where zoning applications are filed could accommodate individuals with wheelchairs, or perhaps if heroin addicts

were barred from entering such facilities. It has no bearing on whether "access to methadone readily exists" in private clinics despite Bill No. 39–02. (Def.'s Mot. at 16.) Likewise, the second regulation, 28 C.F.R. § 35.130(b)(4), applies to "selections" made by a public entity "in determining the site or location of a facility." Again, this provision might apply to a methadone program run by Baltimore County itself, but it is irrelevant to the location of private facilities like START's proposed clinic. *See* 28 C.F.R. pt. 35, App. A, § 35.130 ("Paragraph (b)(4) [of 28 C.F.R. § 35.130] specifically applies the prohibition in § 35.130(b)(3) to the process of selecting sites for construction of new facilities *to be used by the public entity*.") (emphasis added).

■ Finally, even if the regulations were applicable, the facial legality of Bill No. 39–02 under the ADA and the regulations would not defeat count one, which states that the defendants "intentionally denied START equal services, programs, or activities" (Compl.¶ 80). "Otherwise lawful government actions become unlawful when done for the purpose of disadvantaging the handicapped." *Tsombanidis,* 180 F.Supp.2d at 286 (quoting *Smith & Lee Assocs. v. City of Taylor,* 102 F.3d 781, 790 (6th Cir.1996)) (internal quotation marks omitted). Were START to establish that discrimination against the disabled was a "motivating factor" in the passage of Bill No. 39–02, *see Baird v. Rose,* 192 F.3d 462, 470 (4th Cir.1999) (applying the "motivating factor" standard of causation to a Title II claim), START could prevail on a theory of intentional discrimination notwithstanding the facial legality of the law used to thwart its permit request. *See, e.g., Tsombanidis,* 180 F.Supp.2d at 286 (noting that actions "ostensibly authorized by local ordinance" may constitute intentional discrimination)

(internal quotation marks omitted). Moreover, even if the passage of Bill No. 39–02 were legal, the previous irregularities and delays in the handling of START's permit application could by themselves establish a Title II claim, especially considering that START might have received its permit before the new law's effective date if the Permits Department had granted it promptly. *See, e.g., Smith Berch II,* 115 F.Supp.2d at 523–24 (concluding that a policy of requiring methadone clinics, though not other medical offices, to undergo a public hearing before receiving a zoning permit violated Title II); *Sunrise Dev., Inc. v. Town of Huntington,* 62 F.Supp.2d 762, 774 (E.D.N.Y.1999) (listing "departures from normal procedural sequences" and "departures from normal substantive criteria" as factors supporting a finding of discriminatory intent under the ADA) (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

In short, the regulations cited by the defendants are immaterial and do not warrant dismissal of count one.

### D. Appropriate Defendants

The defendants also argue that, even assuming that count one states a valid claim, only Baltimore County is a valid defendant. The defendants recognize that the relevant statutory provision permits suit against "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B) (defining the term "public entity" as it is used in § 12132). They contend, however, that the facts START has alleged do not support a claim against the Permits Department or OZC, and that legislative immunity shields the County Council from liability.

 The defendants' argument with respect to the Permits Department and OZC is based on a misreading of the complaint. Quoting START's allegation that "its fate merely would have been delayed" had the County Council not passed Bill No. 39–02 (Compl.¶ 55), the defendants argue that the Permits Department "did not cause the harm alleged." (Def.'s Mot. at 3.) This analysis overlooks that the delay itself—not to mention other irregularities in the handling of START's application—may violate Title II regardless of the subsequent actions of the County Council. By alleging irregular processing of START's permit request, a history of unequal treatment of methadone clinics, and communication with a County Council member who was openly hostile to heroin addicts, START has alleged adequate facts to state a claim of intentional discrimination on the part of the Permits Department. *See, e.g., Tsombanidis,* 180 F.Supp.2d at 286–89 (finding for the plaintiff in a Title II challenge based on unusual municipal enforcement actions undertaken in an atmosphere of community hostility). As for the OZC, while the defendants are correct that the complaint alleges no specific illegal actions on its part, it is reasonable to infer that this office, which is a component of the Permits Department and is "charged with the responsibility, among other things, of issuing zoning permits in Baltimore County" (Compl.¶ 4), played some role in the unusual procedure applied to START's permit request. That inference is sufficient to preclude dismissal.

 Turning now to the County Council, whether that entity may be liable appears to be an open question. While the Fourth Circuit has established that local governments are not immune from liability for actions of their legislative bodies, *see Berkley v. Common Council of the City of Charleston,* 63 F.3d 295, 296 (4th Cir.1995) (en banc); *Burtnick v. McLean,* 76 F.3d 611, 612–13 (4th Cir.1996), it is conceivable

that immunity could attach to the legislative body itself though the municipality as a whole remained liable. *But see Smith–Berch I*, 68 F.Supp.2d at 618–19 (declining to dismiss ADA claims against the Baltimore County Council and noting that "it is axiomatic that [immunity defenses] are individual in nature and do not apply to either local governments or their agencies"). This possibility, however, is of no consequence in this litigation. Whether or not the County Council is immune, the "real party in interest" is Baltimore County, *see Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1066 n. 2 (4th Cir.1993), and Baltimore County clearly may be liable. Accordingly, the claims against the County Council will not be dismissed.

### E. Permissible Remedies

■ The defendants' final argument against the first count is that Title II permits the award only of declaratory relief in this case, and not of the compensatory, punitive, injunctive, and fee-shifting remedies that START also seeks. Insofar as the defendants concede that declaratory relief is possible, this argument fails by its own terms to indicate that START has not "state[d] a claim upon which relief may be granted." Fed.R.Civ.P. 12(b)(6); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."). While I will reserve a final ruling on the question of remedies until START's claims are adjudicated on the merits, a brief discussion of the defendants' argument may provide guidance to the litigants as the case moves forward.

■ First, the defendants are correct that punitive damages are not available in private actions under the ADA. *See Barnes*

*v. Gorman*, 536 U.S. 181, 189–90, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). The question of compensatory relief, however, is more complicated. While *Barnes* suggests that Title II generally permits compensatory awards, *id.* at 187–88, 122 S.Ct. 2097; *see also Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir.1994) (interpreting remedial provisions of the Rehabilitation Act that are incorporated in the ADA and concluding that "at least as to intentional violations of the statute, a full panoply of legal remedies are available"), the Seventh Circuit recently held that a for-profit drug treatment clinic could not seek lost profits as a remedy for the denial of a zoning permit. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 280 (7th Cir.), *cert. denied,* — U.S. —, 124 S.Ct. 301, 157 L.Ed.2d 144 (2003). The court reasoned that the clinic's standing to bring ADA claims stemmed from its relationship with disabled individuals (the drug addicts it intended to treat), so the remedies available to it "must, at the very least, be those which directly benefit the disabled," *id.* at 281, whereas recovery of lost profits "primarily is designed to benefit its for-profit business," *id.* at 280. Were the Seventh Circuit's reasoning to be applied in this case, it could, as the defendants argue, block START's claims for lost profits and sunk costs—remedies that would benefit START primarily and START's patients only indirectly. The logic of *Discovery House*, however, is in tension with other decisions, including an unpublished opinion by the District of Maryland, which have held that medical providers like START may pursue ADA claims not merely as a matter of third-party standing to assert the rights of their patients, but rather because "the ADA confers the right to sue upon entities who are injured by discrimination because of their association with disabled persons." *Pathways Psychological Support Ctr. v. Town of Leon-*

*ardtown,* No. Civ. A. DKC 99–1362, 1999 WL 1068488, at *2 (D.Md. July 30, 1999) ("*Pathways I*"); *see also MX Group,* 293 F.3d at 335 ("Plaintiff is not an association suing solely on behalf of its members. Instead, it is an entity suing primarily on its own behalf, because of injury it has suffered as a result of its association with individuals with disabilities.") (citing *Pathways I*). If START itself has an affirmative claim based on discrimination against it, it would seem that START should be entitled to relief for any injury it suffered, regardless of the effect, direct or indirect, on the disabled individuals with whom it associated. The conflict between this theory and *Discovery House* will require resolution in the event that START's claims are adjudicated on the merits.

The availability of injunctive relief is another issue that will require further consideration. The implications of *Discovery House* and *MX Group* are, in a sense, reversed on this question. On the one hand, if START has abandoned its efforts to open a methadone clinic in Baltimore County, as appears to be the case (*see* Compl. ¶¶ 60, 64, 65, 68), then START indeed faces no future injury that the court may enjoin. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding that a showing of "real or immediate that the plaintiff will be wronged again" is required to obtain injunctive relief); *Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 820, (D.Md.1998) (same). On the other hand, if START's remedies track those of its patients, as *Discovery House* held, then START should have standing to seek an injunction barring discrimination against those patients—and the history of hostility to methadone clinics in Baltimore County, the resistance START encountered in seeking a permit, and the apparent animus underlying Bill No. 39–02 all could suggest that such discrimination is ongoing. The

court will return to this issue once the facts on these points have been developed.

■ Finally, as to attorney's fees, the court will have discretion to award "a reasonable attorney's fee, including litigation expenses, and costs" to START in the event that START is a "prevailing party" on its ADA claim. 42 U.S.C. § 12205. Whether awarding the fee would benefit START or the disabled is immaterial in light of this explicit statutory provision. *See Discovery House,* 319 F.3d at 281 (indicating that remedies "specifically set out in the statute" are available).

## II. ADA Title IV

Turning now to the second count, START's Title IV claim also remains viable at this stage in the litigation. In this count, START alleges a violation of 42 U.S.C. § 12203(b), which reads as follows:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA].

START argues that because Title II "confers upon START the right to provide methadone treatment services in Baltimore County without being subject to discrimination by Defendants," Title IV must prohibit the defendants from "interfering with that protected right." (Pl.'s Opp'n at 12.)

■ There are a number of potential problems with this count. In the first place, it is not clear that START has the right it claims in its brief. As was noted earlier in the discussion of remedies under Title II, courts are split as to whether the ADA protects entities like START against discrimination in its own right, or merely

confers standing to assert the interests of their patients. *See supra* Part I.E. Even assuming START has such a right, it is not clear that "interference" with it is actionable: whereas corporate entities like START are ordinarily deemed "persons," section 12203(b) applies only to the rights of an "individual." *See Smith–Berch I*, 68 F.Supp.2d at 623 n. 21; *cf.* 42 U.S.C. § 12111(7) (adopting the definition of "person" in 42 U.S.C. § 2000e for purposes of Title I of the ADA); *id.* § 2000e(a) (defining "person" to include, among other things, "one or more individuals"). START's prospective patients were, of course, individuals, but they have no right to receive methadone treatment from START under Title II because START is not a public entity.

■ An alternative theory might suggest that START's permit application was an effort to "aid" the patients in the enjoyment of their right to non-discriminatory zoning, which is a public service. In that case, the obstruction of the permit application and the passage of Bill No. 39–02 could arguably constitute "interference" with that right. The trouble with this theory is that it would interpret the ADA to permit duplicative claims: every discriminatory zoning decision would be actionable under both Title II and Title IV.

It is true, as START observes, that at least one court has interpreted a parallel provision of the Fair Housing Act ("FHA"),[6] 42 U.S.C. § 3617, to permit multiple claims based on discriminatory zoning enforcement. *See United States v. Borough of Audubon*, 797 F.Supp. 353, 362 (D.N.J.1991), *aff'd*, 968 F.2d 14 (3d Cir. 1992).[7] The Second Circuit, however, has described ʻthe notion that the denial of rights may simultaneously constitute interference with those rights as a "somewhat peculiar argument" and "declin[ed] to believe that Congress ever intended such a statutory overlap." *Frazier v. Rominger*, 27 F.3d 828, 833–34 (2d Cir.1994); *see also People Helpers Found. v. City of Richmond*, 781 F.Supp. 1132, 1134 (E.D.Va. 1992) (noting that "most of the [FHA] is designed to prevent illegal discrimination on the part of housing providers," but describing § 3617 as a provision that "specifically prohibits unrelated third parties from interfering with anyone who is attempting to aid others protected under the Act from obtaining housing of their choice"). There is as yet no clear authority in the ADA context, though most decisions upholding § 12203(b) claims appear to involve some wrongful conduct apart from the denial of rights protected by other provisions.[8] *See, e.g., Fogleman v. Mer-*

---

6. The language of the FHA provision is identical to § 12203(b) except that it applies to the rights of "any person," as opposed to "any individual." *See* 42 U.S.C. § 3617.

7. START cites *Samaritan Inns v. District of Columbia*, Civ. A. No. 93 CV 2600 RMU, 1995 WL 405710, at *28 (D.D.C. June 30, 1995), *rev'd on other grounds*, 114 F.3d 1227 (D.C.Cir.1997), in addition, but the decision is unpublished and therefore may not be considered as precedent. *The Stewart B. McKinney Found. v. Town Plan and Zoning Comm'n of the Town of Fairfield*, 790 F.Supp. 1197, 1221 (D.Conn.1992), also upheld redundant FHA claims, but it antedates *Frazier v. Rominger*, 27 F.3d 828, 833–34 (2d Cir.1994), which rejects a duplicative claim under § 3617.

8. The FHA may, in fact, be distinguishable from the ADA, at least where discriminatory zoning is involved. The relevant FHA provision, 42 U.S.C. § 3604(f)(1), prohibits both discrimination "in the sale or rental" by the buyer and efforts by the local government to "make [the dwelling] unavailable" because of a handicap of the prospective occupant. Thus, when a municipality directs unusual zoning scrutiny at a property owner, as took place in *Borough of Audubon*, the zoning action arguably "interferes with" a right—the right to equal consideration by the owner—that is distinct from the right that the zoning action itself violates, namely, the right not to have housing made unavailable by the local government. An ADA suit like START's, by contrast, involves no such multiplicity of

*cy Hosp., Inc.*, 283 F.3d 561, 570–71 (3d Cir.) (holding that § 12203(b) permits a claim of "third-party retaliation" where the plaintiff alleged he was fired because of an ADA suit brought by his father), *cert. denied*, 537 U.S. 824, 123 S.Ct. 112, 154 L.Ed.2d 35 (2002); *Barker v. Int'l Paper Co.*, 993 F.Supp. 10, 15–16 (D.Me.1998) (rejecting a Title I claim alleging discrimination based on the plaintiff's relationship with his disabled wife, but upholding a § 12203(b) claim based on alleged retaliation by the plaintiff's employer after he requested an accommodation on his wife's behalf); *Doe v. Kohn Nast & Graf, PC*, 866 F.Supp. 190, 197 (E.D.Pa.1994) (denying summary judgment with respect to a § 12203(b) claim where the plaintiff alleged "that the firm asked him to leave . . . because it discovered that he planned to file a lawsuit accusing the firm of refusing to renew his contract on the basis of his HIV positive status").

While these issues could lead to dismissal of START's Title IV claim at a later stage, there is no need to address them now. To the extent that START's theory is that a violation of Title II is automatically actionable under Title IV as an "interference" with ADA rights, the Title IV claim adds nothing to the case, because the remedies under the two provisions are identical. *See* 42 U.S.C. § 12203(c) (indicating that the "remedies and procedures" under § 12133 are available for violations of § 12203(b)); *id.* § 12133 (indicating remedies for violations of § 12132). Should START wish to assert that some showing that falls short of a Title II claim may satisfy § 12203(b), it may become necessary to address the conflict in authority as to the meaning of that provision. For the time being, accepting the broader view of § 12203(b) espoused by cases like *Au-*

*dubon* will impose no burden on the defendants beyond what they face in defending the Title II action. Accordingly, the court will not grant the defendants' motion with respect to count two.

## III. 42 U.S.C. § 1983

 Count three of the complaint alleges a deprivation of property without due process of law in violation of the Fourteenth Amendment. (Compl.¶¶ 85–88.) Though the complaint does not indicate the basis for the cause of action, the parties appear to agree that count three is based on 42 U.S.C. § 1983, which affords a private right of action for violations of the United States Constitution committed under color of state law. *See Smith–Berch I*, 68 F.Supp.2d at 625–26 (concluding the complaint stated a claim under § 1983 though the plaintiff had first mentioned the statute in its opposition to a motion to dismiss). Whatever the basis for the cause of action, count three must be dismissed, because the allegations in the complaint are legally insufficient to establish the alleged constitutional violation.

 As both parties acknowledge, a deprivation of property without due process may occur only if the claimant had property to begin with. *See Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 826 (4th Cir.1995). The Constitution does not create property interests; rather, such interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also United*

rights, because START's patients would have no obvious cause of action against START if it

failed to open a methadone clinic.

*Land Corp. of Am. v. Clarke,* 613 F.2d 497, 501 (4th Cir.1980). START identifies the long-term lease as a property interest protected by Maryland law, but the defendants' actions did not deprive START of its lease; they only obstructed the intended use of the lease. *See Smith–Berch I,* 68 F.Supp.2d at 628. Some states protect the owner's interest in property uses that are permitted "as of right" under zoning laws in effect at the time of purchase. *See Scott v. Greenville County,* 716 F.2d 1409, 1418 (4th Cir.1983) (noting that South Carolina law recognizes "an entitlement to the issuance of a permit upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance"). Maryland, however, does not. Indeed, Maryland courts recognize a "vested right" in the existing zoning laws only if the property owner obtains the requisite permit or occupancy certificate and exercises it to such an extent that "the neighborhood may be advised that the land is being devoted to that use." [9] *Sycamore Realty Co. v. People's Counsel of Baltimore County,* 344 Md. 57, 684 A.2d 1331, 1336 (1996) (internal quotation marks omitted). Because START did not obtain the necessary permit, much less exercise it, Maryland law afforded it no protectable interest in using the property as it intended, and the defendants' failure to permit that use did not deprive START of property under the Due Process Clause.[10]

## CONCLUSION

In sum, START's allegations are legally sufficient to state claims under Titles II and IV of the ADA, though not under 42 U.S.C. § 1983. While issues pertaining to the availability of compensatory and equitable remedies under Title II and the viability of START's Title IV theory may require further consideration after the facts have been developed, as of yet there is no reason to dismiss counts one and two of the complaint. Accordingly, the defendants' motion to dismiss the complaint for failure to state a claim will be granted only with respect to count three.

A separate Order follows.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the defendants' Motion to Dismiss (docket no. 6) will be **GRANTED** as to count three of the complaint and **DENIED** as to counts one and two; and

2. copies of this Order and the accompanying Memorandum shall be sent to counsel of record.

---

**9.** START quotes extensively from *Sycamore Realty,* but relies on portions of the opinion discussing a lower court ruling that the *Sycamore Realty* court goes on to reject. (*See* Pl.'s Opp'n at 9–10.)

**10.** Because the absence of a protectable property interest disposes of count three, the court will not address the defendants' alternative argument that some or all of the defendants are not "persons" who may be liable under § 1983.